## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| GARY ELLIOT, derivatively on behalf of ENERGY TRANSFER LP, <br><br> Plaintiffs, <br><br> vs. <br><br> LE GP, LLC, KELCY L. WARREN, THOMAS E. LONG, MARHSALL S. MCCREA, III, BRADFORD D. WHITEHURST, JOHN W. MCREYNOLDS, STEVEN R. ANDERSON, RICHARD D. BRANNON, RAY C. DAVIS, MICHAEL K. GRIMM, JAMES R. PERRY, MATTHEW S. RAMSEY, and RAY WASHBURNE <br><br> Defendants, <br><br> and <br><br> ENERGY TRANSFER LP, <br><br> Nominal Defendant. | Case No.:  3:22-cv-1527 <br><br><br> **DEMAND FOR JURY TRIAL** |

## VERIFIED UNITHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Gary Elliot ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Energy Transfer LP ("Energy Transfer" or the "Partnership"), files this Verified Unitholder Derivative Complaint against Defendants Kelcy L. Warren ("Warren"), Thomas E. Long ("Long"), Marshall S. McCrea, III ("McCrea"), Bradford D. Whitehurst ("Whitehurst"), John W. McReynolds ("McReynolds"), Steven R. Anderson ("Anderson"), Richard D. Brannon ("Brannon"), Ray C. Davis ("Davis"), Michael K. Grimm ("Grimm"), James R. Perry ("Perry"), Matthew S. Ramsey ("Ramsey"), and Ray Washburne ("Washburne") (collectively, the

"Individual Defendants") and Defendant LE GP, LLC ("LE GP" or the "General Partner," and together with the Individual Defendants, the "Defendants") for Defendants' breaches of fiduciary duties as controlling unitholder, directors and/or officers of LE GP, unjust enrichment, waste of corporate assets, abuse of control, and gross mismanagement. As for his complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Energy Transfer, legal filings, news reports, securities analysts' reports and advisories about the Partnership, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a unitholder (i.e., shareholder) derivative action that seeks to remedy wrongdoing committed by LE GP and its officers, directors, and controlling unitholder that caused damage to Energy Transfer between April 13, 2017, and December 20, 2021 (the "Relevant Period").[1]

2.      Energy Transfer is a Dallas, Texas-based energy services company founded in 2002 that primarily conducts its business activities in the U.S. The Partnership is organized as a Delaware limited partnership and operates as a subsidiary of the Partnership's general partner, Defendant LE GP. Defendant LE GP manages, directs, and controls all of Energy Transfer's

---

[1] As Energy Transfer is a limited partnership, shares of the Company's equity, which are publicly traded, are referred to as units and the term unitholder is used instead of shareholder.

activities. According to the Partnership's SEC filings, Energy Transfer does not have officers or directors—rather, it is managed by the Board of Directors (the "Board") and executive officers of the General Partner. Consequently, "the executive officers of [the General Partner] are [Energy Transfer's] executive officers." *See* Partnership's annual report filed with the SEC on Form 10-K on February 18, 2022. The General Partner's "directors and officers have fiduciary duties to manage [Energy Transfer's] business in a manner beneficial to [Energy Transfer] and [its] Unitholders."

3.     The Partnership's operations include inter/intrastate natural gas transportation and storage, natural gas liquids ("NGL") transportation storage, fractionation services, crude, and refined oil transportation, and terminalling, acquisition, and marketing activities. Energy Transfer conducts these operations through its own subsidiaries, which include Energy Transfer Operating, L.P. ("ETO") and Sunoco LP ("Sunoco").

4.     In connection with these operations, the Partnership owns approximately 21,600 miles of intrastate and interstate natural gas transportation pipelines. The Partnership's natural gas transportation systems are among the largest in the U.S. The Partnership also owns and operates three natural gas storage facilities in the state of Texas and two natural gas storage facilities in Oklahoma. The Partnership also owns and operates natural gas gathering including NGL pipelines, processing plants, treating facilities, and conditioning facilities in many states.

5.     One of the Partnership's NGL pipelines is the Rover Pipeline, a 700-mile-long natural gas pipeline extending from southeastern Ohio to southern Michigan. Rover Pipeline, LLC ("Rover"), a subsidiary of Energy Transfer, was responsible for the construction of the Rover Pipeline, which began in 2017.

6.      Throughout the construction of the Rover Pipeline, a drilling process known as horizontal directional drilling ("HDD") was used to install pipes underground. The HDD was done by Pretec Directional Drilling, LLC ("Pretec") and involved the use of drilling fluid for safe and efficient drilling.

7.      On April 13, 2017, during HDD activity near the Tuscarawas River, there was an inadvertent release (an unintended leakage of drilling fluid into the surrounding environment) (the "April 13 Release"). Drilling fluid normally has little environmental impact when leaked; however, it was later discovered that the drilling fluid leaked in connection with the April 13 Release contained toxic diesel fluid along with other unapproved additives.

8.      It was also later revealed that onsite HDD crews were intentionally using diesel fuel and other unapproved additives in the drilling fluid to combat the loss of drilling fluid into the environment. The use of these unapproved and toxic additives helped drilling efficiency, allowing for the onsite crews to keep up with the strict and tight construction schedule imposed by Rover.

9.      As a result, on April 20, 2017, the Ohio Environmental Protection Agency ("Ohio EPA") issued a notice of violation to Rover for the April 13 Release.

10.     In response, on April 27, 2017, in a weekly construction status report to the Federal Energy Regulatory Commission ("FERC"), Rover stated that the April 13 Release was a common occurrence and the drilling fluid leaked was a non-toxic naturally occurring clay.

11.     On May 10, 2017, FERC's Office of Energy Projects ("FERC OEP") issued a letter to Rover, terminating Rover's HDD activity in the area until further authorization was granted.

12.     On June 1, 2017, FERC issued a public statement stating that the Ohio EPA had found presence of diesel fuel in samples of drilling fluid associated with Rover's HDD near the Tuscarawas River.

13.     Only July 31, 2017, J.D. Hair & Associates, Inc. ("JDH&A"), an engineering firm brought in by FERC to analyze HDD activity related to the April 13 Release. JDH&A found that Pretec's HDD activity made in connection with the April 13 Release were not up to HDD industry standard.

14.     On August 21, 2017, FERC's Enforcement Staff began to conduct a non-public formal investigation into the April 13 Release.

15.     Between August 31, 2017, and May 31, 2018, Energy Transfer made several press releases reporting on the progress of the Rover Pipeline project but failed to disclose the formal investigation undertaken by FERC's Enforcement Staff.

16.     The truth begins to emerge on August 8, 2019, two years after the formal investigation by FERC's Enforcement staff began, Energy Transfer disclosed to its investors the non-public formal investigation that was ongoing by FERC's Enforcement Staff, in its quarterly report for the period ended June 30, 2019 (the "2019 Q2 10Q"). Energy Transfer only disclosed that the investigation was happening and failed to disclose any preliminary findings of the investigation nor any language regarding the severity of the investigation.

17.     On this news, Energy Transfer's unit price fell $0.65 per unit, or 4.6%, from $14.03 per unit at close on August 8, 2019, to $13.38 per unit at close on August 12, 2019, over the course of two trading days.

18.     Energy Transfer continued to make surface level disclosures without additional material information in following SEC filings. On February 21, 2020, Energy Transfer filed an

5

annual report with the SEC on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K"). On February 19, 2021, Energy Transfer filed an annual report with the SEC on Form 10-K for the fiscal year ended December 31, 2020 (the "2020 10-K").

19.     The truth full emerged on December 16, 2021, when FERC issued an Order to Show Cause and Notice of Proposed Penalty, providing details of the April 13 Release as a result of the investigation. The order alleged that Rover (1) used diesel fuel and other toxic and unapproved additives in their drilling fluid, (2) failed to monitor the right-of-way, and (3) failed to properly dispose of drilling fluid contaminated with diesel fuel and hydraulic oil. The order also proposed a $40 million civil penalty.

20.     On this news, Energy Transfer's unit price fell $0.14 per unit, or 1.6%, from $8.49 per unit at close on December 16, 2021, to $8.35 per unit at close on December 17, 2021. The unit continued to fall the following two trading day, dropping an additional $0.17 per unit, or 2%, to $8.18 per unit at close on December 21, 2021, and fell a total of $0.31 per unit, or 3.6% from the initial day.

21.     During the Relevant Period, the General Partner and the Individual Defendants breached their fiduciary duties to Energy Transfer by allowing the Partnership to engage in illegal HDD activities, and by personally making and/or causing the Partnership to make to the investing public a series of materially false and misleading statements regarding the Partnership's business, operations, and legal and regulatory compliance. Specifically, the General Partner and the Individual Defendants willfully or recklessly made and/or caused the Partnership to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) Energy Transfer had failed to maintain internal controls and proper procedures to prevent contractors from engaging in illegal HDD activities; (2) the Partnership failed to mitigate known problems in

connection with the foregoing; (3) Energy Transfer, through Rover, hired third-party contractors who engaged in illegal HDD activities which caused massive pollution near the Tuscarawas River; and (4) the severity of the potential civil liabilities as a result of the FERC's Enforcement Staff investigation into the April 13 Release. As a result of the foregoing, Energy Transfer's public statements were materially false and misleading at all relevant times.

22.     The General Partner and the Individual Defendants also breached their fiduciary duties by failing to correct and causing the Partnership to fail to correct these false and misleading statements and omissions of material fact to the investing public.

23.     Additionally, in breach of their fiduciary duties, the General Partner and the Individual Defendants willfully or recklessly caused the Partnership to fail to maintain internal controls.

24.     In light of the General Partner and the Individual Defendants' misconduct, which has subjected the Partnership, the General Partner's two Co-Chief Executive Officers ("CEO"), the General Partner's Chief Financial Officer ("CFO"), the General Partner's former CEO, and former President to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the General Partner and/or who benefitted from the wrongdoing alleged herein, the Partnership will have to expend many millions of dollars.

25.     In light of the breaches of fiduciary duty engaged in by Defendant LE GP, and of the substantial likelihood of LE GP's liability in this derivative action and in the Securities Class

Action, and of it not being disinterested and/or independent, LE GP cannot consider a demand to commence litigation against itself and its officers and directors on behalf of the Partnership with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Securities Exchange Act of 1934 ("Exchange Act").

27.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

28.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

29.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

30.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

31.     Venue is proper in this District because Energy Transfer and the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

32.     Plaintiff is a current unitholder of Energy Transfer. Plaintiff has continuously held Energy Transfer common units since he purchased them in 2013. Plaintiff is a citizen of Texas.

### Nominal Defendant Energy Transfer

33.     Energy Transfer is a Delaware limited partnership with its principal executive offices located at 8111 Westchester Drive, Suite 600, Dallas, Texas 75225. Energy Transfer's common units trade on the New York Stock Exchange ("NYSE") under the ticker symbol "ET."

### Defendant LE GP

34.     LE GP is the general partner of Energy Transfer.

35.     Energy Transfer and LE GP are governed by the Partnership's Partnership Agreement. Per the Partnership Agreement, the General Partner conducts, directs and manages all activities of the Partnership. All management powers over the business and affairs of the Partnership are exclusively vested in the General Partner.

### Defendant Warren

36.     Defendant Warren is a co-founder of Energy Transfer and has served as Executive Chairman of the General Partner since 2007. He has also served as CEO from August 2007 through December 2020. He is also the majority owner of the General Partner.

37.     According to the Partnership's annual statement filed on Form 10-K on February 18, 2022 (the "2021 10-K"), as of February 11, 2022, Defendant Warren beneficially owned 279,049,984 units of the Partnership's common units, representing 9.1% of the Partnership's outstanding common units as of that date. Defendant Warren also beneficially owned 763,021,449 units of the Partnership's Class A units, representing 100% of the Partnership's outstanding Class

A units[2] as of that date. Defendant Warren's combined ownership of common units and Class A units results in a 27.1% voting interest in the Partnership.[3] Defendant Warren also has an 81.2% membership interest in the General Partner making him a majority interest-holder and a controlling unitholder. Given that the price of the Partnership's common unit at the close of trading on February 11, 2022, was $10.30 per unit, Defendant Warren beneficially owned approximately $7.86 billion worth of Energy Transfer units.

38.     For the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), Defendant Warren received $6,392 in total compensation from the General Partner, consisting only of salary. For the fiscal year ended December 31, 2019 (the "2019 Fiscal Year"), Defendant Warren received $6,156 in total compensation, consisting only of salary. For the fiscal year ended December 31, 2018 (the "2018 Fiscal Year"), Defendant Warren received $6,138 in total compensation from the General Partner, consisting only of salary. For the fiscal year ended December 31, 2017 (the "2017 Fiscal Year"), Defendant Warren received $5,926 in total compensation from the General Partner, consisting only of salary. Across the four years, Defendant Warren received $24,612 in total compensation from the General Partner.

39.     The 2021 10-K stated the following regarding Defendant Warren:

**Kelcy L. Warren.** Mr. Warren serves as Executive Chairman of our general partner. Mr. Warren served as Chief Executive Officer from August 2007 through December 2020. He was appointed Co-Chairman of the Board of Directors of our general partner, effective upon the closing of our IPO, and in August 2007, he became the sole Chairman of the Board of our general partner and the Chief Executive Officer and Chairman of the Board of the general partner of ETO until its merger into Energy Transfer LP in April 2021. Prior to August 2007, Mr. Warren had served as Co-Chief Executive Officer and Co-Chairman of the Board of the general partner of ETO since the combination of the midstream and intrastate transportation storage operations of La Grange Acquisition, L.P., and the

---

[2] Energy Transfer Class A units are entitled to vote together with the Partnership's common units but are not convertible into or exchangeable for Partnership common units, and otherwise have no economic attributes.
[3] 601, 076 common units and 100% of the Class A units are held by the General Partner, which Defendant Warren is deemed to own due to his ownership of 81.2% of the General Partner's membership interests.

retail propane operations of Heritage in January 2004. Mr. Warren also served as the Chief Executive Officer of PennTex Midstream Partners, LP's general partner from November 2016 to July 2017. Mr. Warren was selected to serve as a director and as Executive Chairman because he previously served as Chief Executive Officer and has more than 30 years in the natural gas industry. Mr. Warren also has relationships with chief executives and other senior management at natural gas transportation companies throughout the United States and brings a unique and valuable perspective to the Board of Directors.

40.     Upon information and belief, Defendant Warren is a citizen of Texas.

**Defendant Long**

41.     Defendant Long has served as the General Partner's Co-CEO since January 2021 and has served as a director of the General Partner since April 2019. Prior, he served as CFO from February 2016 to January 2021. According to the 2021 10-K, as of February 11, 2022, Defendant Long beneficially owned 666,018 units of the Partnership's common units. Given that the price of the Partnership's common unit at the close of trading on February 11, 2022, was $10.30 per unit, Defendant Long beneficially owned approximately $6.86 million worth of Energy Transfer units.

42.     For the fiscal Year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Long received $19,730,203 in total compensation from the General Partner. This included $1,322,750 in salary, $15,224,039 in equity awards, $3,156,400 in non-equity incentive plan compensation, and $27,014 in all other compensation. For the 2020 Fiscal Year, Defendant Long received $3,425,935 in total compensation from the General Partner. This included $623,077 in salary, $2,781,255 in equity awards, and $21,603 in all other compensation. For the 2019 Fiscal Year, Defendant Long received 4,845,208 in total compensation. This included $570,869 in salary, $3,352,795 in equity awards, $900,000 in non-equity incentive plan compensation, and $21,544 in all other compensation. For the 2018 Fiscal Year, Defendant Long received $6,609,967 in total compensation, which consisted of $537,338 in salary, $1,000,000 in bonus,

$4,251,335 in equity awards, $800,000 in non-equity incentive plan compensation, and $21,294 in all other compensation. For the 2017 Fiscal Year, Defendant Long received $3,644,220 in total compensation, which consisted of $480,846 in salary, $2,519,954 in equity awards, $625,100 in non-equity incentive plan compensation, and $18,320 in all other compensation. Across five years, Defendant Long received $38, 255,533 from the General Partner.

43.     The 2021 10-K stated the following about Defendant Long:

***Thomas E. Long.*** Mr. Long has served as the Co-Chief Executive Officer of our general partner since January 2021. Mr. Long served as Chief Financial Officer of Energy Transfer's general partner from February 2016 until January 2021 and has been a director of our general partner since April 2019. Mr. Long also served as the Chief Financial Officer and as a director of PennTex Midstream Partners, LP's general partner from November 2016 to July 2017. Mr. Long also served as Chief Financial Officer of ETO until its merger into Energy Transfer LP in April 2021 and was previously Executive Vice President and Chief Financial Officer of Regency GP LLC from November 2010 to April 2015. Mr. Long served as a director of Sunoco LP from May 2016 until May 2021 and has served as Chairman of the Board of USAC since April 2018. Mr. Long was selected to serve on our Board of Directors because of his understanding of energy-related corporate finance gained through his extensive experience in the energy industry.

44.     Upon information and belief, Defendant Long is a citizen of Texas.

**Defendant McCrea**

45.     Defendant McCrea has served as Co-CEO of the General Partnership since January 2021 and as a director of the General Partnership since December 2009. Prior, he served as the President and the Chief Commercial Officer ("CCO") from October 2018 to December 2020. According to the 2021 10-K, as of February 11, 2021, Defendant McCrea beneficially owned 2,752,342 units of the Partnership's common units. Given that the price of the Partnership's common unit at the close of trading on February 11, 2022, was $10.30 per unit, Defendant McCrea beneficially owned approximately $28.35 million worth of Energy Transfer units.

46.     For the 2021 Fiscal Year, Defendant McCrea received $21,460,652 in total compensation from the General Partner, which consisted of $1,322,750 in salary, $3,225,000 in bonus, $13,734,458 in equity awards, $3,156,400 in non-equity incentive plan compensation, and $22,044 in all other compensation. For the 2020 Fiscal Year, Defendant McCrea received $7,572,984 in total compensation from the General Partner, which consisted of $1,157,423 in salary, $1,800,000 in bonus, $4,597,516 in equity awards, and $18,045 in all other compensation. For the 2019 Fiscal Year, Defendant McCrea received 11,601,341 in total compensation, which consisted of $1,094,260 in salary, $8,734,720 in equity awards, $1,750,817 in non-equity incentive plan compensation, and $21,544 in all other compensation. For the 2018 Fiscal Year, Defendant McCrea received $10,780,120 in total compensation, which consisted of $1,059,976 in salary, $7,834,782 in equity awards, $1,866,000 in non-equity incentive plan compensation, and $19,362 in all other compensation. For the 2017 Fiscal Year, Defendant McCrea received $11,722,575 in total compensation, which consisted of $1,027,846 in salary, $9,033,341 in equity awards, $1,644,554 in non-equity incentive plan compensation, and $16,834 in all other compensation. Across five years, Defendant McCrea received $63,137,672 from the General Partner.

47.     The 2021 10-K stated the following about Defendant McCrea:

**Marshall S. (Mackie) McCrea, III.** Mr. McCrea has served as the Co-Chief Executive Officer of our general partner since January 2021. Prior to that he was the President and Chief Commercial Officer of our general partner, having served in that role since October 2018 following the merger of Energy Transfer Equity, L.P., and Energy Transfer Partners, L.P. Prior to that time, he had been the Group Chief Operating Officer and Chief Commercial Officer of the Energy Transfer family since November 2015. Mr. McCrea has served on the Board of Directors of our general partner since December 2009. Mr. McCrea was appointed as a director of the general partner of ETO in December 2009 and served in that capacity until ETO's merger into Energy Transfer LP in April 2021. Prior to December 2009, he served as President and Chief Operating Officer of ETO's general partner from June 2008 to November 2015 and President – Midstream

from March 2007 to June 2008. Previously he served as the Senior Vice President – Commercial Development since January 2004. In March 2005, Mr. McCrea was named President of La Grange Acquisition LP, ETO's primary operating subsidiary, after serving as Senior Vice President-Business Development and Producer Services since 1997. Mr. McCrea also served as the Chairman of the Board of Directors of the general partner of Sunoco Logistics Partners L.P. from October 2012 to April 2017. Mr. McCrea was selected to serve as a director because he brings extensive project development and operational experience to the Board. He has held various positions in the natural gas business over the past 25 years and is able to assist the Board of Directors in creating and executing the Partnership's strategic plan.

48.     Upon information and belief, Defendant McCrea is a citizen of Texas.

**Defendant Whitehurst**

49.     Defendant Whitehurst served as CFO of Energy Transfer since January 2021. Prior, he served as Executive Vice President – Head of Tax from August 2014 through December 2020. According to the 2021 10-K, as of February 11, 2022, Defendant Whitehurst beneficially owned 436,512 units of the Partnership's common units. Given that the price of the Partnership's common unit at the close of trading on February 11, 2022, was $10.30 per unit, Defendant Whitehurst beneficially owned approximately $4.49 million worth of Energy Transfer units.

50.     For the 2021 Fiscal Year, Defendant Whitehurst received $4,897,867 in total compensation from the General Partner, which consisted of $605,413 in salary, $3,102,694 in equity awards, $1,174,000 in non-equity incentive plan compensation, and $15,760 in all other compensation. For the 2020 Fiscal Year, Defendant Whitehurst received $3,194,276 in total compensation from the General Partner, which consisted of $581,202 in salary, $2,596,850 in equity awards, and $16,224 in all other compensation. Across two years, Defendant Whitehurst received $8,092,143 from the General Partner.

51.     The 2021 10-K stated the following about Defendant Whitehurst:

***Bradford D. Whitehurst.*** Mr. Whitehurst was appointed Chief Financial Officer of Energy Transfer in January 2021. From August 2014 through December 2020,

14

he served as Executive Vice President – Head of Tax. Prior to joining Energy Transfer, Mr. Whitehurst was a partner in the Washington, DC office of Bingham McCutchen LLP and an attorney in the Washington, DC offices of both McKee Nelson LLP and Hogan & Hartson. Mr. Whitehurst has specialized in partnership taxation and has advised Energy Transfer and its subsidiaries in his role as outside counsel since 2006. He has served as a member of the board of directors of USAC since April 2019.

52.     Upon information and belief, Defendant Whitehurst is a citizen of Texas.

**Defendant McReynolds**

53.     Defendant McReynolds served as a director of the Partnership since August 2004. Prior, he has served as the President of the Partnership from March 2005 through October 2018. According to the 2021 10-K, as of February 11, 2022, Defendant McReynolds beneficially owned 30,225,200 units of the Partnership's common units. Given that the price of the Partnership's common unit at the close of trading on February 11, 2022, was $10.30 per unit, Defendant McReynolds beneficially owned approximately $311.32 million worth of Energy Transfer units.

54.     For the 2018 Fiscal Year, Defendant McReynolds received $1,422,273 in total compensation, which consisted of $606,306 in salary, $800,000 in non-equity incentive plan compensation, and $15,967 in all other compensation. For the 2017 Fiscal Year, Defendant McReynolds received $1,367,413 in total compensation, which consisted of $587,928 in salary, $764,306 in non-equity incentive plan compensation, and $15,179 in all other compensation. Across two years, Defendant McReynolds received $2,789,686 from the General Partner.

55.     The 2021 10-K stated the following about Defendant McReynolds:

***John W. McReynolds.*** Mr. McReynolds is a director of Energy Transfer LP, having served in that capacity since August 2004. Mr. McReynolds previously served as the President of Energy Transfer LP from March 2005 until October 2018; at which time he became Special Advisor to the Partnership. Mr. McReynolds also previously served as our Chief Financial Officer from August 2005 to June 2013. Prior to becoming President of Energy Transfer LP, Mr. McReynolds was a partner in the international law firm of Hunton & Williams LLP for over 20 years. As a lawyer, he specialized in energy related finance,

securities, partnerships, mergers and acquisitions, syndication, and litigation matters, and served as an expert in numerous arbitration, litigation, and governmental proceedings, including as an expert in special projects for boards of directors of public companies. Mr. McReynolds was selected to serve in the indicated roles with Energy Transfer because of this extensive background and experience, as well as his many contacts and relationships in the industry.

56.     Upon information and belief, Defendant McReynolds is a citizen of Texas.

**Defendant Anderson**

57.     Defendant Anderson has served as a director of the General Partner since June 2018. He also serves as a member of the General Partner's Audit Committee and Compensation Committee. According to the 2021 10-K, as of February 11, 2022, Defendant Anderson beneficially owned 1,550,656 units of the Partnership's common units. Given that the price of the Partnership's common unit at the close of trading on February 11, 2022, was $10.30 per unit, Defendant Anderson beneficially owned approximately $15.97 million worth of Energy Transfer units.

58.     For the 2021 Fiscal Year, Defendant Anderson received $222,503 in total compensation from the General Partner, which consisted of $122,500 in fees paid in cash and $100,003 in unit awards. For the 2020 Fiscal Year, Defendant Anderson received $222,497 in total compensation from the General Partner, which consisted of 122,500 in fees paid in cash and $99,997 in unit awards. For the 2019 Fiscal Year, Defendant Anderson received 222,498 in total compensation from the General Partner, which consisted of $122,500 in fees paid in cash and $99,998 in unit awards. For the 2018 Fiscal Year, Defendant Anderson received $135,960 in total compensation from the General Partner, which consisted of $91,760 in fees paid in cash and $44,200 in unit awards. Across the four years, Defendant Anderson received a total of $803,438 from the General Partner.

59.     The 2021 10-K stated the following about Defendant Anderson:

***Steven R. Anderson.*** Mr. Anderson was elected to the Board of Directors of our general partner in June 2018 and serves on the audit committee and compensation committee. Mr. Anderson began his career in the energy business in the early 1970's with Conoco in the Permian Basin area. He then spent some 25 years with ANR Pipeline and its successor, The Coastal Corporation, as a natural gas supply and midstream executive. He later was Vice President of Commercial Operations with Aquila Midstream and, upon the sale of that business to Energy Transfer in 2002, he became a part of the management team there. For the six years prior to his retirement from Energy Transfer in October 2009, he served as Vice President of Mergers and Acquisitions. Since that time, he has been involved in private investments and has served on the boards of directors of the St. John Health System and Saint Simeon's Episcopal Home in Tulsa, Oklahoma, as well as various other community and civic organizations. Mr. Anderson also served as a member of the board of directors of Sunoco Logistics Partners L.P. from October 2012 until April 2017. Mr. Anderson was selected to serve on our Board of Directors based on his experience in the midstream energy industry generally, and his knowledge of Energy Transfer's business specifically. Mr. Anderson also brings recent experience on audit and compensation committees of another publicly traded partnership.

60.     Upon information and belief, Defendant Anderson is a citizen of Texas.

**Defendant Brannon**

61.     Defendant Brannon has served as a director of the General Partner since March 2016. He also serves as the Chairman of the General Partner's Audit Committee. According to the 2021 10-K, as of February 11, 2022, Defendant Brannon beneficially owned 471,629 units of the Partnership's common units. Given that the price of the Partnership's common unit at the close of trading on February 11, 2022, was $10.30 per unit, Defendant Brannon beneficially owned approximately $4.86 million worth of Energy Transfer units.

62.     For the 2021 Fiscal Year, Defendant Brannon received $225,003 in total compensation from the General Partner, which consisted of $125,000 in fees paid in cash and $100,003 in unit awards. For the 2020 Fiscal Year, Defendant Brannon received $224,997 in total compensation from the General Partner, which consisted of 125,000 in fees paid in cash and $99,997 in unit awards. For the 2019 Fiscal Year, Defendant Bannon received 224,998 in total

compensation from the General Partner, which consisted of $125,000 in fees paid in cash and $99,998 in unit awards. For the 2018 Fiscal Year, Defendant Brannon received $294,225 in total compensation from the General Partner, which consisted of $194,225 in fees paid in cash and $100,000 in unit awards. For the 2017 Fiscal Year, Defendant Brannon received $183,956 in total compensation from the General Partner, which consisted of $83,965 in fees paid in cash and $99,991 in unit awards. Across the five years, Defendant Brannon received a total of $1,153,179 from the General Partner.

63.    The 2021 10-K stated the following about Defendant Brannon:

***Richard D. Brannon.*** Mr. Brannon was appointed to the Board of Directors of our general partner in March 2016 and has served as the Chairman of the audit committee since April 2016. Mr. Brannon is the CEO of CH4 Energy Six, LLC and Uinta Wax, LLC, both independent companies focused on horizontal oil and gas development. Mr. Brannon previously served on the board of directors of WildHorse Resource Development from its IPO in December 2016 until June 2018. Mr. Brannon also formerly served on the Board of Directors and as a member of the audit committee and compensation committee of Sunoco LP, Regency, OEC Compression and Cornerstone Natural Gas Corp. He has over 35 years of experience in the energy business, having started his career in 1981 with Texas Oil & Gas. The members of our general partner selected Mr. Brannon to serve as director based on his knowledge of the energy industry and his experience as a director and audit and compensation committee member for other public companies.

64.    Upon information and belief, Defendant Brannon is a citizen of Texas.

**Defendant Davis**

65.    Defendant Davis is a co-founder of Energy Transfer and has served as a director of the General Partner since July 2018. Prior, he has served as a director of ETO from February 2013 to February 2018. According to the 2021 10-K, as of February 11, 2022, Defendant Davis beneficially owned 90,114,776 units of the Partnership's common units, representing approximately 2.9% of the Partnership's total outstanding common units. Given that the price of the Partnership's common unit at the close of trading on February 11, 2022, was 10.30 per unit,

Defendant Davis beneficially owned approximately $928.18 million worth of Energy Transfer units.

66.     For the 2021 Fiscal Year, Defendant Davis received $200,003 in total compensation from the General Partner, which consisted of $100,000 in fees paid in cash and $100,003 in unit awards. For the 2020 Fiscal Year, Defendant Davis received $199,997 in total compensation from the General Partner, which consisted of 100,000 in fees paid in cash and $99,997 in unit awards. For the 2019 Fiscal Year, Defendant Davis received $199,998 in total compensation from the General Partner, which consisted of $100,000 in fees paid in cash and $99,998 in unit awards. For the 2018 Fiscal Year, Defendant Davis received $117,450 in total compensation from the General Partner, which consisted of $74,750 in fees paid in cash and $42,700 in unit awards. Across the four years, Defendant Davis received a total of $717,448 from the General Partner.

67.     The 2021 10-K stated the following about Defendant Davis:

*Ray C. Davis.* Mr. Davis was appointed to the Board of Directors of the general partner of Energy Transfer LP in July 2018 and served on the Board of Directors of ETO from February 2018 until July 2018. From February 2013 until February 2018, Mr. Davis was an independent investor. He has also been a principal owner, and served as co-chairman of the board of directors, of the Texas Rangers major league baseball club since August 2010. Mr. Davis previously served on the Board of Directors of Energy Transfer LP, effective upon the closing of its IPO in February 2006 until his resignation in February 2013. Mr. Davis also served as ETO's Co-Chief Executive Officer from the combination of the midstream and transportation operations and the retail propane operations in January 2004 until his retirement from these positions in August 2007, and as the Co-Chairman of the Board of Directors of our general partner from January 2004 until June 2011. Mr. Davis also held various executive positions with Energy Transfer prior to 2004. Mr. Davis was selected to serve as director based on his over 40 years of business experience in the energy industry and his expertise in the Partnership's asset portfolio.

68.     Upon information and belief, Defendant Davis is a citizen of Texas.

**Defendant Grimm**

69.      Defendant Grimm has served as a director of the General Partner since October 2018 and serves as a member of the General Partner's Audit Committee and Compensation Committee. He has also served as a director of ETO since December 2005. According to the 2021 10-K, as of February 11, 2022, Defendant Grimm beneficially owned 151,400 units of the Partnership's common units. Given that the price of the Partnership's common unit at the close of trading on February 11, 2022, was $10.30 per unit, Defendant Grimm beneficially owned approximately $1.56 million worth of Energy Transfer units.

70.      For the 2021 Fiscal Year, Defendant Grimm received $230,003 in total compensation from the General Partner, which consisted of $130,000 in fees paid in cash and $100,003 in unit awards. For the 2020 Fiscal Year, Defendant Grimm received $229,997 in total compensation from the General Partner, which consisted of 130,000 in fees paid in cash and $99,997 in unit awards. For the 2019 Fiscal Year, Defendant Grimm received $229,998 in total compensation from the General Partner, which consisted of $130,000 in fees paid in cash and $99,998 in unit awards. For the 2018 Fiscal Year, Defendant Grimm received $305,493 in total compensation from the General Partner, which consisted of $205,425 in fees paid in cash and $100,068 in unit awards. Across the four years, Defendant Grimm received a total of $995,491 from the General Partner.

71.      The 2021 10-K stated the following about Defendant Grimm:

*Michael K. Grimm.* Mr. Grimm was appointed to the Board of Directors of our general partner in October 2018 and has served on the audit committee and compensation committee since that time. Prior to that time, Mr. Grimm served as a director of ETO's general partner beginning in December 2005 and served on the audit and compensation committee during that time. Mr. Grimm is one of the original founders of Rising Star Energy, L.L.C., a privately held upstream exploration and production company active in onshore continental United States and served as its President and Chief Executive Officer from 1995 until 2006 when

it was sold. Mr. Grimm is currently President of Rising Star Petroleum, LLC. Mr. Grimm was formerly Chairman of the Board of RSP Permian, Inc. (NYSE: RSPP) from January 2014 until June 2018. From November 2018 until it was sold in 2019, Mr. Grimm served on the Board of Directors of Anadarko Petroleum Corporation. Prior to the formation of Rising Star, Mr. Grimm was Vice President of Worldwide Exploration and Land for Placid Oil Company from 1990 to 1994. Prior to joining Placid Oil Company, Mr. Grimm was employed by Amoco Production Company for thirteen years where he held numerous positions throughout the exploration department in Houston, New Orleans, and Chicago. Mr. Grimm has been an active member of the American Association of Professional Landmen, Dallas Wildcat Committee, Dallas Producers Club, and the All-American Wildcatters. He has a B.B.A. from the University of Texas at Austin. Mr. Grimm was selected to serve as a director because of his extensive experience in the energy industry and his service as a senior executive at several energy-related companies, in addition to his contacts in the industry gained through his involvement in energy related organizations.

72.    Upon information and belief, Defendant Grimm is a citizen of Texas.

**Defendant Perry**

73.    Defendant Perry has served as a director of the General Partner since January 2020. According to the 2021 10-K, as of February 11, 2022, Defendant Perry beneficially owned 120,020 units of the Partnership's common units. Given that the price of the Partnership's common unit at the close of trading on February 11, 2022, was $10.30 per unit, Defendant Perry beneficially owned approximately $1.23 million worth of Energy Transfer units.

74.    For the 2021 Fiscal Year, Defendant Perry received $200,003 in total compensation from the General Partner, which consisted of $100,000 in fees paid in cash and $100,003 in unit awards. For the 2020 Fiscal Year, Defendant Perry received $174,997 in total compensation from the General Partner, which consisted of $75,000 in fees paid in cash and $99,997 in unit awards. Across the two years, Defendant Perry received a total of $375,000 from the General Partner.

75.    The 2021 10-K stated the following about Defendant Perry:

*James R. (Rick) Perry.* Mr. Perry was appointed to the Board of Directors of our general partner in January 2020. He formerly served as U.S. Secretary of Energy from March 2017 until December 2019. Prior to that, he served as the Governor of the State of Texas from 2000 until January 2015. Mr. Perry served as Lieutenant Governor of Texas from 1998 to 2000, and as Agriculture Commissioner from 1991 to 1998. Prior to 1991, he also served in the Texas House of Representatives. Mr. Perry previously served on the Board of Directors of ETO from February 2015 until December 2016. Mr. Perry was selected to serve as a director because of his vast experience as an executive in the highest office of state government. In addition, Mr. Perry has been involved in finance and budget planning processes throughout his career in government as a member of the Texas House Appropriations Committee, the Legislative Budget Board and as Governor.

76.     Upon information and belief, Defendant Perry is a citizen of Texas.

**Defendant Ramsey**

77.     Defendant Ramsey has served as a director of the General Partner since July 2012. Prior, he served as the Chief Operating Officer ("COO") of the General Partner from October 2018 to April 2021. According to the 2021 10-K, as of February 11, 2022, Defendant Ramsey beneficially owned 568,077 units of the Partnership's common units. Given that the price of the Partnership's common unit at the close of trading on February 11, 2022, was $10.30, Defendant Ramsey beneficially owned approximately $5.85 million worth of Energy Transfer units.

78.     For the 2021 Fiscal Year, Defendant Ramsey received $2,103,955 in total compensation from the General Partner, which consisted of $708,788 in salary, $1,374,000 in non-equity incentive plan compensation, and $21,167 in all other compensation. For the 2020 Fiscal Year, Defendant Ramsey received $3,975,257 in total compensation from the General Partner, which consisted of $723,390 in salary, $3,229,770 in equity awards, and $22,097 in all other compensation. For the 2019 Fiscal Year, Defendant Ramsey received $4,715,743 in total compensation from the General Partner, which consisted of $683,913 in salary, $3,123,186 in equity awards, $889,100 in non-equity inceptive plan compensation, and $19,544 in all other compensation. For the 2018 Fiscal Year, Defendant Ramsey received $4,400,195 in total

compensation from the General Partner, which consisted of $662,486 in salary, $2,818,415 in equity awards, $900,000 in non-equity incentive plan compensation, and $19,294 in all other compensation. For the 2017 Fiscal Year, Defendant Ramsey received $5,260,040 in total compensation from the General Partner, which consisted of $642,404 in salary, $3,763,893 in equity awards, $835,125 in non-equity incentive plan compensation, and $18,618 in all other compensation. Across the five years, Defendant Ramsey received a total of $20,455,190 from the General Partner.

79.    The 2021 10-K stated the following about Defendant Ramsey:

**Matthew S. Ramsey.** Mr. Ramsey was appointed as a director of Energy Transfer's general partner in July 2012 and served as a director of ETO's general partner from November 2015 until its merger into Energy Transfer LP in April 2021. Mr. Ramsey has been the Chief Operating Officer or our general partner since October 2018 following the merger of Energy Transfer Equity, L.P. and Energy Transfer Partners, L.P., and served as President and Chief Operating Officer of ETO's general partner from November 2015 until its merger into Energy Transfer LP in April 2021. Mr. Ramsey also served as President and Chief Operating Officer and Chairman of the board of directors of PennTex Midstream Partners, LP's general partner from November 2016 to July 2017. Mr. Ramsey is also a director of Sunoco LP, having served as chairman of Sunoco LP's board since April 2015, and of USAC, having served on that board since April 2018. Mr. Ramsey previously served as President of RPM Exploration, Ltd., a private oil, and gas exploration partnership, and previously served as a director of RSP Permian, Inc. where he served on the audit and compensation committees. In addition to his work in the energy business, Mr. Ramsey serves on the board of directors of the National Association of Manufacturers and as a Trustee of the Southwestern Medical Foundation. He is the former Chairman of the University of Texas Chancellor's Council. Mr. Ramsey holds a B.B.A. in Marketing from the University of Texas at Austin and a J.D. from South Texas College of Law. Mr. Ramsey was selected to serve based on vast experience in the oil and gas space and Energy Transfer believes that he provides valuable industry insight as a member of our Board of Directors.

80.    Upon information and belief, Defendant Ramsey is a citizen of Texas.

**Defendant Washburne**

81.     Defendant Washburne has served as a director of the General Partner from April 2019 to April 1, 2022.

82.     For the 2021 Fiscal Year, Defendant Washburne received $207,503 in total compensation from the General Partner, which consisted of $107,500 in fees paid in cash and $100,003 in unit awards. For the 2020 Fiscal Year, Defendant Washburne received $207,497 in total compensation from the General Partner, which consisted of 107,500 in fees paid in cash and $99,997 in unit awards. For the 2019 Fiscal Year, Defendant Washburne received $81,881 in total compensation from the General Partner, which consisted of $48,756 in fees paid in cash and $33,125 in unit awards. Across the three years, Defendant Washburne received a total of $496,881 from the General Partner.

83.     The 2021 10-K states the following about Defendant Washburne:

*Ray W. Washburne.* Mr. Washburne was appointed to the Board of Directors of our general partner in April 2019. He is currently President and Chief Executive Officer of Charter Holdings, Inc., a Dallas-based investment company involved in real estate, restaurants, and diversified financial investments. In addition, he currently serves on the President's Intelligence Advisory Board (PIAB). From August 2017 to February 2019, Mr. Washburne served as the President and Chief Executive Officer of the Overseas Private Investment Corporation (OPIC), the United States government's development finance institution. From 2000 to 2017, Mr. Washburne served on the board of directors of Veritex Holdings, Inc. (Nasdaq: VBTX), a Texas -based bank holding company that conducts banking activities through its subsidiary, Veritex Community Bank. He has also served as an adjunct professor at the Cox School of Business at Southern Methodist University. Mr. Washburne is also a member of the Republican Governors Association Executive Roundtable, the American Enterprise Institute, the Council on Foreign Relations, and is on the Advisory Board of the United States Southern Command. Mr. Washburne was selected to serve on the Board of Directors because of his expertise in international finance, his relationships in government, and his experience on the board of a publicly traded company.

84.     Upon information and belief, Defendant Washburne is a citizen of Texas.

24

## FIDUCIARY DUTIES OF THE DEFENDANTS

85.     By reason of Defendant LE GP's role as the general partner of Energy Transfer, and by reason of the Individual Defendants' positions as controlling unitholder, officers, directors, and/or fiduciaries of the General Partner and the Partnership, and because of their ability to control the business and corporate affairs of Energy Transfer, Defendant LE GP and the Individual Defendants owed Energy Transfer and its unitholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Energy Transfer in a fair, just, honest, and equitable manner.  The General Partner and the Individual Defendants were and are required to act in furtherance of the best interests of Energy Transfer and its unitholders so as to benefit all unitholders equally.

86.     The General Partner, and each controlling unitholder, director and officer of the General Partner owes to Energy Transfer and its unitholders the fiduciary duty to exercise good faith and diligence in the administration of the Partnership and in the use and preservation of its property and assets and the highest obligations of fair dealing.

87.     The General Partner, as well as the Individual Defendants, because of their positions of control and authority as controlling unitholder, directors and/or officers of the General Partner, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

88.     To discharge their duties, the General Partner, the controlling unitholder, the officers, and directors of the General Partner were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Partnership.

89.     Defendant LE GP, by virtue of its role as general partner of the Partnership, and each Individual Defendant, by virtue of his or her position as a control unitholder, director and/or

officer, owed to the Partnership and to its unitholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Partnership, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the General Partner, the absence of good faith on their part, or a reckless disregard for their duties to the Partnership and its unitholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Partnership.

90.     As general partner, and senior executive officers and directors of the general partner of a publicly-traded partnership whose common units were registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Defendants, including Defendant Warren as a controlling unitholder, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Partnership's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Partnership's business, prospects, and operations, and had a duty to cause the Partnership to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Partnership's common unit would be based upon truthful and accurate information.

91.     To discharge their duties, the General Partner and the officers and directors of the General Partner were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Partnership. By virtue of such duties, the officers and directors of the General Partner were required to, among other things:

(a)     ensure that the Partnership was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Energy Transfer's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Partnership in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Partnership's assets, and to maximize the value of the Partnership's unit;

(c)     remain informed as to how Energy Transfer conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Energy Transfer and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Energy Transfer's operations would comply with all applicable laws and Transfer's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Partnership's unitholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Partnership's officers and employees and any other reports or information that the Partnership was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Partnership insiders at the expense of the Partnership; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Partnership and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

92.    The General Partner and each of the Individual Defendants furthered owed to Energy Transfer and the unitholders the duty of loyalty requiring that each favor Energy Transfer's interests and that of its unitholders over their own while conducting the affairs of the Partnership and refrain from using their position, influence, or knowledge of the affairs of the Partnership to gain personal advantage.

93.    At all times relevant hereto, the Individual Defendants were the agents of each other, of the General Partner, and of Energy Transfer and were at all times acting within the course and scope of such agency.

94.    Because of their advisory, executive, managerial, directorial, and controlling unitholder positions with the General Partner, each of the Individual Defendants had access to adverse, non-public information about the Partnership.

95.    The Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Energy Transfer.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

96.    In committing the wrongful acts alleged herein, the Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Defendants caused the Partnership to

conceal the true facts as alleged herein. The Defendants further aided and abetted and assisted each other in breaching their respective duties.

97.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the General Partner and the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Partnership's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Partnership's unit price.

98.     The Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Partnership purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Defendants collectively and individually took the actions set forth herein.

99.     The General Partner and each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

100.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants, of the General Partner, and of Energy Transfer, and was at all times acting within the course and scope of such agency.

## ENERGY TRANSFER'S CODE OF CONDUCT

101.    The Partnership's Code of Conduct states the following with respect to its policy objectives:

> LE GP, LLC (the "Company"), the general partner of Energy Transfer LP (the "Partnership"), has adopted a number of policies dealing with business conduct and ethics of the Company and the Partnership (collectively, the "Partnership Group"). We believe that strict adherence to these policies is not only right, but is in the best interest of the Company, its unitholders, its customers, and the industry in general. ***In all instances, the policies of the Company require that the business of the Partnership Group be conducted in a lawful and ethical manner***. ***Every Employee acting on behalf of the Partnership Group must adhere to these policies***.

(Emphasis added).

102.    The Code of Conduct defines the term "Employee" as including "all employees of the Partnership Group who provide services to or for the benefit of the Partnership Group, and the officers and members of the Board of Directors of the Partnership."

103.    In a section titled, "Compliance with Laws, Rules and Regulations," the Code of Conduct states the following:

> ***The ethical standards of the Partnership Group rest on obeying the law. Employees must respect and obey the laws of the cities, states, and countries in which the Partnership Group operates***. This Code of Business Conduct and Ethics obviously cannot mention every law that might be applicable. Although not all individuals are expected to know the details of these laws, it is important for Employees to be familiar with the laws that apply to their respective areas of responsibility, and to know enough to determine when to seek advice from supervisors, managers, the Company's President, or other appropriate personnel. Because the Company is the general partner of a publicly traded partnership, Employees should be aware of the laws regarding the trading of securities of the Partnership while in possession of material, non-public information relating to the Partnership.

(Emphasis added).

104.    In a section titled, "Conflicts of Interest," the Code of Conduct states the following, in relevant part:

30

A "conflict of interest" occurs when an individual's private interest interferes in any way, or even appears to interfere, with the interests of the Partnership Group as a whole. A conflict situation can arise when an Employee takes actions or has interests that may make it difficult to perform his/her work for the Partnership Group objectively and effectively. Conflicts of interest also arise when an Employee, or a member of his/her family, receives improper personal benefits as a result of his/her position in the Partnership Group. Loans to, or guarantees of obligations of, such persons are of special concern.

* * *

You must avoid conflicts of interest unless specific, written pre-approval has been obtained from the Company's President. In the absence of pre-approval, you must abandon or forfeit the activity or interest that creates the conflict or seek a waiver pursuant to the provisions of this Code of Business Conduct and Ethics. Any pre-approval for an executive officer must be obtained from the Board of Directors.

105.    In a section titled, "Sensitive Payments," the Code of Conduct provides that Partnership funds may not be used to secure special treatment for the Partnership or the General Partner, stating the following:

> ***It is against the policy of the Partnership Group to authorize payment of or to use Partnership Group funds or personal funds for Sensitive Payments or other similar payment, whether lawful or unlawful, designed to secure special treatment for the Partnership Group***. It is also contrary to the policy of the Partnership Group to employ any intermediary to make such payments or to disguise such payment(s) as a commission, refund or in any other manner. Should an Employee become involved in any situation where (i) a request is made for any Sensitive Payment or any bribe, kickback or other payment the propriety of which is questionable, or where (ii) the Employee has any knowledge of payments being made to an agent which are in excess of reasonable fees for services rendered, it is the Employee's responsibility to report the situation immediately to his/her immediate supervisor.

(Emphasis added).

106.    The Code of Conduct defines the term "Sensitive Payments" as including:

a)    receipts from or payments to governmental officials or employees;

b)    commercial bribes or kickbacks;

c)    amounts received with an understanding that rebates or refunds will be made in contravention of the laws of any jurisdiction, either directly or through a third party;

      d)     corporate political contributions; and

      e)     payments or commitments (whether cast in the form of commissions, payments or fees for goods or services received or otherwise) made with the understanding or under circumstances that would indicate that all or part thereof is to be paid by the recipient to governmental officials or employees, or as a commercial bribe, influence payment or kickback.

107.    In a section titled, "Protection and Proper Use of Assets and Proprietary Information," the Code of Conduct provides the following, in relevant part:

    All Employees should protect the assets of the Partnership Group and ensure their efficient use. Theft, carelessness, and waste have a direct impact on the Partnership Group's profitability. All assets of the Partnership Group should be used only for legitimate business purposes. The use of Company equipment, property, or proprietary information in violation of this Code, or for any use other than its intended business use, is prohibited unless otherwise authorized.

108.    In a section titled, "Ethical Behavior," the Code of Conduct states the following, in relevant part:

    ***Every Employee is expected to act with honesty and integrity, in good faith, responsibly, with due care, competence and diligence, without misrepresentation or omission of material facts, and without compromising their independent judgment. Each Employee is required to adhere to the highest ethical standards in fulfilling our responsibilities to, and on behalf of the Partnership Group and its investors***. ***Each Employee is required to deal fairly and honestly with other employees, customers, vendors and third parties***. Each Employee should actively encourage ethical conduct among his or her fellow officers, directors, and employees. When collecting information or other data on competitors of the Partnership Group, Employees must use only legitimate resources and not take any actions that are illegal, unethical or could cause embarrassment to the Partnership Group.

(Emphasis added).

109.    In a section titled, "Financial Record Keeping," the Code of Conduct states the following:

    It is our policy that all books and records of the Partnership Group fully and fairly reflect the assets, liabilities, receipts, and expenditures of the Partnership Group.

***Attempts to create false or misleading records are forbidden. No undisclosed funds or accounts shall be established for any purpose***. Knowledge of secret cash funds or slush funds should be reported to the Company's President or to the Audit Committee of the Board.

(Emphasis added).

110.   In a section titled, "Report Preparation," the Code of Conduct states the following:

Accounting and reporting standards and procedures established by the Partnership Group must be followed to ensure that assets are protected and properly used, and that financial records and reports are accurate and reliable. ***Financial statements published by the Partnership Group must fairly present its operating results and financial position***. Improper or fraudulent accounting, documentation or financial reporting are in violation of our policy and may also be in violation of applicable laws. ***All internal records supporting the financial statements of the Partnership Group must be prepared accurately, completely, and properly***.

(Emphasis added).

111.   In a section titled, "Full, Fair, Accurate and Timely Disclosure for SEC Filings,"

the Code of Conduct states the following:

The Partnership Group has established policies and procedures that help to ensure that each SEC report and public communication (including press releases) contains information that is full, fair, accurate, timely and understandable. ***Every Employee must follow these policies and procedures to ensure that this information is timely, accurate, consistent, and credible***.

(Emphasis added).

112.   In a section titled, "Concealment of Information from Auditors," the Code of

Conduct states the following:

It is our policy for Employees to provide the Company's Chief Financial Officer and his/her accounting staff and outside auditors with any and all information they request. Since the audit function is a vital tool of management in the conduct of the affairs of the Partnership Group, the concealment of information, whether financial or operational, or allowing misleading information to be provided to the internal accounting staff or outside auditors could result in inaccurate evaluations and improper decisions concerning the activities of the Partnership Group.

113.     In a section titled, "Reporting Suspected Violations of this Code," the Code of Conduct provides that all officers and directors must report violations or suspected violations of the Code of Conduct, including violations pertaining to the securities laws, breaches of fiduciary duty, and the Partnership's internal controls. The Code of Conduct states the following:

> Every Employee shall first report violations or potential violations of this Code to his or her supervisor(s), or the appropriate officer of the Partnership Group, of the Employee's complaint or concerns. ***Every officer and director of the Partnership Group, regardless of whether such person is also an Employee, shall report violations or potential violations of this Code to another officer or director of the Partnership Group to whom such person is required to report, one of the Chief Financial Officer, the President, or the Audit Committee, and if appropriate, to the Board of Directors***. Because Employees may be reluctant or unable to report such violations or potential violations dealing with a material violation of the securities laws, breach of fiduciary duty or that relate to accounting, internal accounting controls and auditing matters, the Audit Committee has also established procedures providing for the confidential and anonymous reporting of violations to the Audit Committee or such other committee or department established by the Audit Committee for receiving and reviewing reports of violations. Retaliation against any employee who in good faith reports a suspected violation will not be tolerated. ***All reports of suspected violations will be evaluated by the Audit Committee or persons designated by it to investigate such reports***. An investigation of the reported violation will be conducted if the evaluation indicates that there is a likelihood that a problem exists. All Employees are obliged to cooperate with such investigations and to be truthful and forthcoming in the course of such investigations. ***Persons violating the standards in this Code, including failure to report fraud, will be subject to appropriate disciplinary action***, which may include written notice of a violation, censure by the Board, demotion, suspension, loss of pay, termination, referral for criminal prosecution, and restitution to the Partnership or others for any losses or damages resulting from the violation

(Emphasis added).

114.     The General Partner and the Individual Defendants violated the Code of Conduct by engaging in or permitting the scheme to allow the Partnership to engage in illegal HDD activities, and to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets, and failing to

report the same. Moreover, in violation of the Code of Conduct, the Defendants failed to maintain the accuracy of Partnership records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## ENERGY TRANSFER'S SUPPLEMENTAL CODE OF ETHICS

115.    Additionally, the Partnership maintains a Code of Ethics for Senior Financial Officers (the "Code of Ethics"), which states that it applies to the General Partner's CEO and CFO and provides that the obligations of the Code of Ethics "supplement, but do not replace, the Code of Business Conduct and Ethics applicable to all employees of the Partnership and its subsidiaries, as well as the Partnership's officers and directors."

116.    The Code of Ethics states that the General Partner's CEO and CFO must:

> ***Act with honesty and integrity, avoiding actual or apparent conflicts of interest with the Company and the Partnership in professional relationships that would likely be viewed as materially impairing the Senior Financial Officer's exercise of judgment on behalf of the Company or the Partnership***. Avoid actual or apparent conflicts of interest in all cases unless a specific, case‑by‑case exception has been made after review and approval of specific circumstances by the Board of Directors. Prohibited conflicts of interests for Senior Financial Officers include significant work for an outside employer, or transactions between the Company or the Partnership and any other enterprise in which the Senior Financial Officer has an interest (other than owning a de minimis amount of publicly traded securities), including those in which a family member of a Senior Financial Officer has an interest.
>
> ***Take reasonable steps to cause the Partnership to provide fair, accurate, timely, and understandable disclosure in reports and documents that the Partnership files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications***, including taking reasonable steps to cause the employees providing services to the Partnership to follow its internal accounting controls at all times.
>
> ***Not violate applicable laws, rules and regulations of federal, state, and local governments, and other appropriate private and public regulatory agencies***. Although no single individual is expected to know the details of all laws, rules, and regulations, it is important to take reasonable steps to ensure familiarity with all such laws, rules, and regulations and to know enough to determine when to

seek advice or guidance through the retention of qualified legal, financial, and accounting experts, or other means.

* * *

***Establish and maintain disclosure controls and procedures that ensure that material information is included in each periodic report during the period in which the periodic report is being prepared***.

* * *

***Bring to the attention of the Chairman of the Audit Committee of the Board of Directors matters that could compromise the integrity of the Partnership's public filings and communications***, disagreements on accounting matters and violations of any part of this Code.

(Emphasis added).

117.    Defendants Long, McCrea, and Whitehurst violated the Code of Ethics by engaging in or permitting the scheme to cause the Partnership to allow the Partnership to engage in illegal HDD activities, and to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets, and failing to report the same. Moreover, in violation of the Code of Ethics, Defendants Long, McCrea, and Whitehurst failed to maintain the accuracy of Partnership records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## ENERGY TRANSFER'S CORPORATE GOVERNANCE GUIDELINES

118.    The Partnership also maintains Corporate Governance Guidelines that provide governance guidelines adopted by the Board defining the Board's responsibilities to the Partnership, also known as the "Partnership." Specifically, the governance guidelines outline in relevant part that:

[t]he functions of the Board is to provide guidance to and controls on the activities of the Partnership, in the exercise of the business judgment of each individual director. In discharging that obligation, directors should be entitled to rely on the honesty and integrity of the senior management of the General Partner and the Partnership and their outside advisors and auditors.

119.    In a section titled "Chief Executive Officer Evaluation: Management Succession" the governance guidelines provide that:

A. *CEO Evaluation.* The Compensation Committee will conduct an annual review of the Chief Executive Officer's performance, as provided in its charter. ***The Board of Directors will review the Compensation Committee's report with a view to ensuring that the Chief Executive Officer is providing appropriate leadership for the Partnership Group in the long- and short-term***.

(Emphasis added).

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

120.    Energy Transfer is a Dallas, Texas-based energy services company, primarily doing business in the U.S. The Partnership is organized as a Delaware limited partnership and operates as a subsidiary of the Partnership's general partner, Defendant LE GP. Defendant LE GP manages and directs all of Energy Transfer's activities, and the officers and directors of Defendant LE GP function as the officers and directors of Energy Transfer. The Partnership was founded in 2002 and formerly operated under the name, Energy Transfer Equity, L.P. The Partnership changed its name in October 2018.

121.    With respect to Defendant LE GP's control over the Partnership's activities, the 2018 10-K states the following:

Our general partner, LE GP, LLC, manages and directs all of our activities. The officers and directors of ET are officers and directors of LE GP, LLC. The members of our general partner elect our general partner's Board of Directors. The board of directors of our general partner has the authority to appoint our executive officers, subject to provisions in the limited liability company agreement of our general partner. Pursuant to other authority, the board of directors of our general partner may appoint additional management personnel to assist in the management

of our operations and, in the event of the death, resignation or removal of our chief executive officer, to appoint a replacement.

122.    Energy Transfer itself possesses several subsidiaries, including ETO and Sunoco, through which the Partnership conducts its business and operations. The Partnership's operations include natural gas transportation and storage, NGL transportation, storage, and fractionation services, crude, and refined oil transportation, and terminalling, acquisition, and marketing activities. In connection with these operations, the Partnership owns approximately 21,600 miles of intrastate and interstate natural gas transportation pipelines. The Partnership's natural gas transportation systems are among the largest in the U.S. The Partnership also owns and operates three natural gas storage facilities in the state of Texas and two natural gas storage facilities in Oklahoma. The Partnership also owns and operates natural gas gathering including NGL pipelines, processing plants, treating facilities, and conditioning facilities in many states.

123.    The Rover Pipeline project was a proposed interstate natural gas pipeline system, spanning 711 miles, intended to transport natural gas from processing facilities located in Ohio, Pennsylvania, and West Virginia to markets in the Midwest and Southeast United States as well as eastern Canada. FERC approved this project in February 2017.

124.    Rover a subsidiary of Energy Transfer, was responsible for the construction of the Rover Pipeline, including hiring and management of contractors necessary for the construction. Rover contracted with Prevision Pipeline LLC ("Precision"), an infrastructure and utility contractor ultimately responsible for a majority of the installation of the Rover Pipeline. Precision subcontracted with Pretec, a company specializing in horizontal directional drilling.

125.    Horizontal directional drilling ("HDD"), also known as directional boring, is a low impact installation method for underground utilities, such as pipes, conduit, or cables. The benefit to directional boring as opposed to the traditional cut-and-cover utility installation method is the

minimal surface disruption, cut-and-cover installation requires digging a trench, laying utilities, and then recovering, process that is not practical when installing through roads, railways, rivers, or urban areas.

126.     Horizontal directional drilling is split into three stages, the pilot hole, pre-reaming, and pipe pullback. The pilot hole stage involves using a small diameter drill bit to drill a horizontal hole underneath any obstacles along a predetermined design path. The pre-reaming stage involves enlarging the initial hole to a sufficient size to install the necessary pipeline, this is done by pulling progressively larger reamers back and forth through the bore (the hole that is being drilled). The final pipe pullback stage involves installing the product pipe into hole by pulling it from the exit pit back towards the entry pit.

127.     To aid the drill bit, for both initial pilot hole and subsequent reamers, in cutting through soil and rock, drilling fluid is pumped through the drill pipe, where it exits the drill bit through nozzles. The purpose of the drilling fluid is to cool and lubricate the drill bit, control formation pressures, removing cuttings from the bore, sealing permeable formations encountered while drilling, and most importantly stabilizing the bore. A constant supply of drilling fluid is necessary to the success of horizontal directional drilling as the drill bit requires constant lubrication to prevent damage and the bore requires stabilization that the fluid provides.

128.     Under normal conditions, the drilling fluid, after being pumped out of the drill bit, will mix with the soil and any bedrock cuttings and flow back to containment pits at the entry or exit points, where the cuttings will be removed, and the drill fluid recycled for immediate reuse. Sometimes, the drilling fluid can leak out of the bore and into fractures and caverns of the surrounding earth. In severe cases, the drilling fluid may leak further, emerging at the surface, or even entering undesirable locations such as nearby bodies of water or wetlands, also known as an

inadvertent release. In these situations, the loss of drilling fluid to the surrounding environment creates a situation where drilling fluid is pumped into the bore but less is returning to be recycled requiring the onsite team to mix additional drilling fluid to be used. When there is little to no drilling fluid loss, the same drilling fluid will be constantly filtered and reused creating for a very efficient drilling process. However, when loss of drilling fluid is high, replacement of the drilling fluid becomes a very labor-intensive. Onsite workers must cut open and mix clay with water to create new drilling fluid, if drilling fluid loss is high, the drilling may be stopped to await the delivery of additional clay and water to mix drilling fluid. This creates a situation where onsite workers may feel tempted to add unlawful additives, such as diesel fuel, into the drilling fluid mixture to speed up the process and keep up with a tight schedule. If this were to be followed by an inadvertent release, then the drilling fluid containing unlawful additives would be leaked into the surrounding environment causing environmental damage and contamination. This occurred during the horizontal directional drilling of the Rover Pipeline project.

129.    On February 2, 2017, the Rover Pipeline project was approved by FERC in an order issuing certificates. The order also imposed forty-five environmental restrictions. The following day, on February 3, 2017, Rover filed a statement accepting the FERC's order issuing certificates.

130.    On March 3, 2017, Rover filed a request for immediate issuance of a notice to proceed with FERC. On the same day, FERC issued a notice to proceed with construction, marking the beginning of the construction of the Rover pipeline. On March 18, 2017, Pretec's crew began the horizontal directional drilling process at the construction site near the Tuscarawas River.

131.    On April 13, 2017, during the horizontal drilling process there was a large inadvertent release (the "April 13 Release"). It was later uncovered that nearly 2 million gallons of drilling fluid had been leaked, contaminating the west side of the Tuscarawas River.

132.    Following this incident, on April 20, 2017, the Ohio EPA issued a notice of violation to Rover. Also, in response to the April 13 Release, on May 10, 2017, FERC OEP issued a letter to Rover, terminating Rover's horizontal directional drilling activity until further authorization is granted.

133.    On June 1, 2017, FERC issued a public statement stating that Ohio EPA had informed them of the presence of diesel fuel in the samples of drilling fluid associated with Rover's Tuscarawas River HDD. The public statement further stated that the presence of diesel fuel is inconsistent with Rover's commitments within the approval certificate and would fully support FERC OEP's investigation into the issue.

134.    Throughout the course of the investigation, Energy Transfer, and Individual Defendants, fully aware of the gravity of their misconduct, made false and misleading statements and omissions regarding the severity of this legal proceeding in an attempt to conceal the truth from public investors.

**Materially False and Misleading Statements Issued During the Relevant Period**

***April 27, 2017, Weekly Report***

135.    On April 27, 2017, in a weekly construction and environmental status report filed with FERC, Rover stated, in connection with the April 13 Release, that "[d]ue to the subsurface conditions and other environmental conditions of the locations," the April 13 Release was "a ***common and normal*** component of executing directional drilling operations[.]" This was a gross understatement as to the severity of environmental harm that was being caused. Rover continued

by stating that the leaked drilling fluid was "*a non-toxic*, naturally occurring bentonite clay water slurry that [was] safe for the environment[.]" It was later discovered that Pretec's HDD workers had encountered losses of drilling fluid since the first day of HDD activity and that from April 2, 2017 through April 13, 2017, they "intentionally and routinely" added *toxic diesel fuel* along with other unapproved lubricants to overcome drilling difficulties and drilling fluid loss in order to keep up with Rover's management's tight construction schedule.

### JDH&A Report

136.    On July 31, 2017, JDH&A, an engineering firm brought in by FERC to study the April 13 Release, released a report (the "JDH&A Report"). The JDH&A Report revealed that:

> [Pretec] did not provide documentation in their daily reports as to any other drilling practices, such as adjusting drilling fluid properties, or mixing a thick bentonite plug in an attempt to seal the formation. In addition, they did not document procedures or measures for minimizing the risk of an IR while continuing without drilling fluid circulation. Due to the lack of operational details and commentary in [Pretec]'s reports, it is not possible for JDH&A to provide a firm opinion with respect to whether or not [Pretec]'s operational measures to restore circulation or their drilling procedure to minimize the risk of IR's met HDD industry standards. **If [Pretec] performed no other measures than what is indicated in their reports, then it is the opinion of JDH&A that they did fall short of common HDD industry practices used to restore drill fluid circulation** as outlined in Drilling Fluids in Pipeline Installation by Horizontal Directional Drilling.

(Emphasis added).

Although the JDH&A Report did not discuss the discovery of diesel fuel within the drilling fluid at the Tuscarawas River, the JDH&A Report's comments regarding Pretec's conduct falling short of HDD industry practices would definitely concern investors.

### August 4, 2017, Response Letter

137.    In response to the JDH&A Report, on August 4, 2017, Rover sent a letter to FERC, in an attempt to mitigate negative public perception of its misconduct, rejected the idea that the

diesel fuel was mixed into its drilling fluid and cited alternative theories as to the cause of the diesel fuel. Specifically, the letter stated, in relevant part:

> Rover theorizes that these diesel concentrations could have been caused by an *inadvertent and unreported spill or leak from equipment operating during the clean-up of the IR*, or it could have been the *deliberate or malicious act of individuals opposed to the project*. Given the extensive inspection and oversite at this and other site along the project, *it is difficult to imagine that this occurred from an unreported spill or leak*.

(Emphasis added).

138.    On August 21, 2017, FERC's Enforcement Staff began to conduct a non-public, formal investigation into the presence of diesel fuel in the drilling fluid found in the Tuscarawas River in connection with the April 13 Release.

### *August 31, 2017, to May 1, 2018, Press Releases*

139.    After this, Energy Transfer made several press releases announcing the continued progress of the Rover Pipeline project and approvals made by FERC, but materially omitted to mention the formal on-going investigation being conducted by FERC's Enforcement Staff.

140.    On August 31, 2017, Energy Transfer issued a press release titled, "Energy Transfer Announces FERC Approval to Put Phase 1A of the Rover Pipeline in Service." The press release stated, in relevant part:

> Energy Transfer Partners (NYSE: ETP) announced today that the Federal Energy Regulatory Commission (FERC) approved its request to put Phase 1A of the Rover Pipeline into service. Phase 1A, the 212-mile section from Cadiz, Ohio to Defiance, Ohio, will begin natural gas service on August 31, 2017.

141.    On September 19, 2017, Energy Transfer issued a press release titled, "Energy Transfer Partners Announced Pricing of $2.25 Billion of Senior Notes." The press release stated, in relevant part:

> Energy Transfer Partners (NYSE:ETP) is pleased to announce that the Federal Energy Regulatory Commission (FERC) has approved the Partnership's request

to resume Horizontal Directional Drilling (HDD) operations along the Rover Pipeline Project. Drilling operations on nine HDD locations approved by the FERC are expected to begin within the week with an emphasis on the Captina Creek HDD in Belmont County, Ohio. The completion of the Captina Creek HDD will allow the full Phase 1 portion of Rover from Seneca, Ohio, to Defiance, Ohio, to be placed into service by the end of the year. Phase 1a of the Rover Project from Cadiz, Ohio, to Defiance, Ohio, was successfully put into service on August 31, 2017.

142.    On December 15, 2017, Energy Transfer issued a press release titled, "Energy Transfer Announces FERC Approval to Place Rover Pipeline's Phase 1B into Service." The press release stated, in relevant part:

> Energy Transfer Partners, L.P. (NYSE: ETP) announced today that Rover Pipeline, LLC received approval from the Federal Energy Regulatory Commission (FERC) to place Phase 1B of the Rover Pipeline project into service, bringing the 713-mile pipeline closer to its 3.25 billion cubic feet per day design total. With the addition of the Phase 1B facilities, the project is now capable of transporting up to 1.7 billion cubic feet per day of natural gas. Rover shippers now have access to six additional receipt points from Seneca thru Clarington areas of the Marcellus and Utica supply basins with an incremental receipt capacity of 2.45 billion cubic feet per day. Rover has been in partial service from Cadiz, Ohio, to Defiance, Ohio since August 31, 2017, capable of transporting 1 billion cubic feet per day of natural gas.

143.    On May 1, 2018, Energy Transfer issued a press release titled, "Energy Transfer Announces FERC Approval to Place Additional Facilities on Rover Pipeline's Phase 2 into Service." The press release stated, in relevant part:

> Energy Transfer Partners, L.P. (NYSE: ETP) announced today that Rover Pipeline, LLC received approval from the Federal Energy Regulatory Commission (FERC) to place additional Phase 2 facilities into service. Last week, FERC granted Rover permission to place a segment of Phase 2, which included Mainline Compressor Station 3 located in Crawford County, Ohio, and a section of the line between Mainline Compressor Station 2, in Wayne County, Ohio, and Mainline Compressor Station 3, in service for additional throughput opportunity. The approval from FERC granted today allows for the full commercial operation capability of the Market Zone North Segment.

144.    On May 31, 2018, Energy Transfer issued a press release titled, "Energy Transfer Announces FERC Approval to Place Rover Pipeline's Full Mainline B into Service." The press release stated, in relevant part:

> Energy Transfer Partners, L.P. (NYSE: ETP) announced today that Rover Pipeline, LLC received approval from the Federal Energy Regulatory Commission (FERC) to commence service of the Supply Connector B and full Mainline B pipeline segments. This latest approval allows for 100 percent of Rover's mainline capacity, 3.25 billion cubic feet per day of natural gas, to be placed into service.

145.    While omitting material information regarding the investigation from the press releases, executives at Energy Transfer and Rover, disclosed by a FERC order at a later date, were busy "preserving" their documents and data in response to FERC's subpoenas. For example, on October 3, 2017, Joey Mahmoud, Executive Vice President of Engineering and Construction for Rover, in an affidavit to FERC Enforcement Staff, stated that he had accidentally deleted all the data stored within his phone and was unable to preserve the data in accordance with preservation notices. In November 2017, FERC Enforcement Staff issued an additional subpoena with Rover's production to be completed in March 2018. However, in May 2018, Rover produced over 4,000 previously withheld or redacted documents not included in their privilege claims.

### February 23, 2018, Form 10-K

146.    On February 23, 2018, Energy Transfer filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2017 (the "2017 10-K"), signed by Defendants Warren, Long, McCrea, McReynolds, Brannon, and Ramsey. The 2017 10-K discussed the capacity of the partially completed Rover Pipeline, stated in relevant part:

> The Rover Pipeline is a new 713-mile natural gas pipeline designed to transport 3.25 Bcf/d of domestically produced natural gas from the Marcellus and Utica Shale production areas to markets across the United States as well as into the Union Gas Dawn Storage Hub in Ontario, Canada, for redistribution back into the United States or into the Canadian market. Currently under construction, portions of the pipeline are in service transporting gas from processing plants in Eastern

Ohio for delivery to other pipeline interconnects in Eastern Ohio as well as the Midwest Hub near Defiance, Ohio, where the gas will be delivered for distribution to markets across the United States. The Rover Pipeline Phase 1A and 1B are in service with a capacity of approximately 1.7 Bcf/d.

147.    The 2017 10-K also makes mention of Rover's compliance with FERC requirements, stating in relevant part:

> In addition, on May 10, 2017, the FERC prohibited Rover from conducting HDD activities at 27 sites in Ohio. On July 31, 2017, the FERC issued an independent third party assessment of what led to the release at the Tuscarawas River site and what Rover can do to prevent reoccurrence once the HDD suspension is lifted. **Rover notified the FERC of its intention to implement the suggestions in the assessment and to implement additional voluntary protocols. In response, FERC authorized Rover to resume HDD activities at certain sites**. On January 24, 2018, FERC ordered Rover to cease HDD activities at the Tuscarawas River HDD site pending FERC review of additional information from Rover. Rover continues to correspond with regulators regarding drilling operations and drilling plans at the HDD sites where Rover has not yet completed HDD activities, including the Tuscarawas River HDD site. The timing or outcome of this matter cannot be reasonably determined at this time. **We do not expect there to be a material impact to its results of operations, cash flows or financial position.**

(Emphasis added.)

148.    Attached to the 2017 10-K as Exhibits 31.1, 31.2, 32.1, and 32.2 were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Long and McReynolds, certifying that "[the 2017 10-K] does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made […] not misleading" and that "the information contained in the [2017 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Partnership."

149.    However, the 2017 10-K failed to disclose material information, such as the FERC's Enforcement Staff formal investigation into the April 13 Release as well as JDH&A Report's assessment of Pretec's HDD practices of drilling fluid circulation, used in connection with the April 13 Release, were not up to HDD industry standards.

46

### *May 10, 2018, Form 10-Q*

150.    On May 10, 2018, Energy Transfer filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2018 (the "2018 Q1 10-Q"), signed by Defendant Long. Attached to the 2018 Q1 10-Q as exhibits were certifications pursuant to SOX signed by Defendants McReynolds and Long, certifying that "[the 2018 Q1 10-Q] does not contain any untrue statement of a material fact or omit to state a material fact or omit to state a material fact necessary to make the statements made […] not misleading" and that "the information contained in the [2018 Q1 10-Q] fairly presents, in all material respects, the financial condition and results of operations in the Partnership." However, the 2018 Q1 10-Q failed to disclose material information, such as the FERC's Enforcement Staff formal investigation into the April 13 Release as well as JDH&A Report's assessment of Pretec's HDD practices of drilling fluid circulation, used in connection with the April 13 Release, were not up to HDD industry standards.

### *August 9, 2018, Form 10-Q*

151.    On August 9, 2018, Energy Transfer filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2018 (the "2018 Q2 10-Q"), signed by Defendant Long. Attached to the 2018 Q2 10-Q as exhibits were certifications pursuant to SOX signed by Defendants McReynolds and Long, certifying that "[the 2018 Q2 10-Q] does not contain any untrue statement of a material fact or omit to state a material fact or omit to state a material fact necessary to make the statements made […] not misleading" and that "the information contained in the [2018 Q2 10-Q] fairly presents, in all material respects, the financial condition and results of operations in the Partnership." However, the 2018 Q2 10-Q failed to disclose material information, such as the FERC's Enforcement Staff formal investigation into the April 13 Release

as well as JDH&A Report's assessment of Pretec's HDD practices of drilling fluid circulation, used in connection with the April 13 Release, were not up to HDD industry standards.

### November 8, 2018, Form 10-Q

152.    On November 8, 2018, Energy Transfer filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2018 (the "2018 Q3 10-Q"). Attached to the 2018 Q3 10-Q as exhibits were certifications pursuant to SOX signed by Defendants Warren and Long, certifying that "[the 2018 Q3 10-Q] does not contain any untrue statement of a material fact or omit to state a material fact or omit to state a material fact necessary to make the statements made [...] not misleading" and that "the information contained in the [2018 Q3 10-Q] fairly presents, in all material respects, the financial condition and results of operations in the Partnership." However, the 2018 Q3 10-Q failed to disclose material information, such as the FERC's Enforcement Staff formal investigation into the April 13 Release as well as JDH&A Report's assessment of Pretec's HDD practices of drilling fluid circulation, used in connection with the April 13 Release, were not up to HDD industry standards.

### February 22, 2019, Form 10-K

153.    On February 22, 2019, Energy Transfer filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2018 (the "2018 10-K"), signed by Defendants Warren, Long, McCrea, McReynolds, Ramsey, Anderson, Brannon, Davis, and Grimm. Attached to the 2018 10-K as exhibits were certifications pursuant to SOX signed by Defendants Warren and Long, certifying that "[the 2018 10-K] does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made [...] not misleading" and that "the information contained in the [2018 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Partnership." However, the 2018 10-K failed

to disclose material information, such as the FERC's Enforcement Staff formal investigation into the April 13 Release as well as JDH&A Report's assessment of Pretec's HDD practices of drilling fluid circulation, used in connection with the April 13 Release, were not up to HDD industry standards.

### *May 9, 2019, Form 10-Q*

154.    On May 9, 2019, Energy Transfer filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2019 (the "2019 Q1 10-Q"). Attached to the 2019 Q1 10-Q as exhibits were certifications pursuant to SOX signed by Defendants Warren and Long, certifying that "[the 2019 Q1 10-Q] does not contain any untrue statement of a material fact or omit to state a material fact or omit to state a material fact necessary to make the statements made […] not misleading" and that "the information contained in the [2019 Q1 10-Q] fairly presents, in all material respects, the financial condition and results of operations in the Partnership." However, the 2019 Q1 10-Q failed to disclose material information, such as the FERC's Enforcement Staff formal investigation into the April 13 Release as well as JDH&A Report's assessment of Pretec's HDD practices of drilling fluid circulation, used in connection with the April 13 Release, were not up to HDD industry standards.

155.    From as early as January 2021, FERC Enforcement Staff issued a letter to Rover. The letter stated that there would be a recommendation to FERC to issue an Order to Show Cause and Notice of Proposed Penalty to Rover. The order provided an opportunity for Rover to explain why it should not be the subject of an enforcement proceeding and pay a penalty. Energy Transfer made no disclosures regarding this material information to investors.

**The Truth Begins to Emerge**

***August 8, 2019, Form 10-Q***

156.    On August 8, 2019, Energy Transfer filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2019 (the "2019 Q2 10-Q"). ***Two years after*** the formal investigation by the Enforcement Staff began, Energy Transfer finally disclosed that the FERC Enforcement Staff had initiated a formal investigation "regarding allegations that diesel fuel ***may have been included*** in the drilling mud at the Tuscarawas River HDD" (emphasis added). The 2019 Q2 10-Q continued to state, in relevant part:

> Rover and the Partnership are cooperating with the investigations. ***Enforcement Staff has provided Rover its non-public preliminary findings regarding those investigations.*** The company disagrees with those findings and intends to vigorously defend against any potential penalty. Given the stage of the proceedings, and the non-public nature of the investigation, the Partnership is unable at this time to provide an assessment of the potential outcome or range of potential liability, if any.

(Emphasis added.)

157.    On this news, Energy Transfer's unit price fell $0.65 per unit, or 4.6%, from $14.03 per unit at close on August 8, 2019, to $13.38 per unit at close on August 12, 2019, over the course of two trading days.

158.    Aside from the minor disclosure that the Enforcement Staff investigation had been occurring, the 2019 Q2 10-Q failed to disclose information regarding the preliminary findings provided to Rover by the Enforcement Staff nor did it provide any notice or language regarding the severity of the on-going Enforcement Staff investigation. As a result of Individual Defendant's continued false and misleading statements and omissions the Partnership's unit continued to trade at artificially inflated prices throughout the Relevant Period.

*February 21, 2020, Form 10-K*

159.    On February 21, 2020, Energy Transfer filed its 2019 10-K, signed by Defendants Warren, Long, McReynolds, McCrea, Ramsey, Anderson, Brannon, Davis, Grimm, Perry, and Washburne. Attached to the 2019 10-K as exhibits were certifications pursuant to SOX signed by Defendants Warren and Long, certifying that "[the 2019 10-K] does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made […] not misleading" and that "the information contained in the [2019 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Partnership." Energy Transfer continued to make the same surface level disclosures, stated, in relevant part:

> In mid-2017, FERC Enforcement Staff began a non-public investigation regarding allegations that diesel fuel *may have been included* in the drilling mud at the Tuscarawas River horizontal directional drilling ("HDD") operations. Rover and the Partnership are cooperating with the investigations. ***Enforcement Staff has provided Rover its non-public preliminary findings regarding those investigations.*** The company disagrees with those findings and intends to vigorously defend against any potential penalty. Given the stage of the proceedings, and the non-public nature of the investigation, the Partnership is unable at this time to provide an assessment of the potential outcome or range of potential liability, if any.

(Emphasis added.)

160.    On this news, Energy Transfer's unit price fell $0.99 per unit, or 7.8%, from $12.54 per unit at close on February 20, 2020, to $11.55 per unit at close on February 24, 2020, over the course of two trading days.

161.    Aside from the minor disclosure that the Enforcement Staff investigation had been occurring, the 2019 10-K failed to disclose information regarding the preliminary findings provided to Rover by the Enforcement Staff nor did it provide any notice or language regarding the severity of the on-going Enforcement Staff investigation. As a result of Individual Defendant's

continued false and misleading statements and omissions the Partnership's unit continued to trade at artificially inflated prices throughout the Relevant Period.

### *February 19, 2021, Form 10-K*

162.    On February 19, 2021, Energy Transfer filed its 2020 10-K, signed by Defendants Warren, McCrea, Long, Whitehurst, Ramsey, Anderson, Brannon, Davis, Grimm, McReynolds, Perry, and Washburne. Attached to the 2020 10-K as exhibits were certifications pursuant to SOX signed by Defendants Warren and Long, certifying that "[the 2020 10-K] does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made […] not misleading" and that "the information contained in the [2020 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Partnership." Energy Transfer continued to make the same surface level disclosures, stated, in relevant part:

> In mid-2017, FERC Enforcement Staff began a non-public investigation regarding allegations that diesel fuel *may have been included* in the drilling mud at the Tuscarawas River horizontal directional drilling ("HDD") operations. Rover and the Partnership are cooperating with the investigations. ***Enforcement Staff has provided Rover its non-public preliminary findings regarding those investigations.*** The company disagrees with those findings and intends to vigorously defend against any potential penalty. Given the stage of the proceedings, and the non-public nature of the investigation, the Partnership is unable at this time to provide an assessment of the potential outcome or range of potential liability, if any.

(Emphasis added.)

163.    Aside from the minor disclosure that the Enforcement Staff investigation had been occurring, the 2020 10-K failed to disclose information regarding the preliminary findings provided to Rover by the Enforcement Staff nor did it provide any notice or language regarding the severity of the on-going Enforcement Staff investigation. As a result of Individual Defendant's continued false and misleading statements and omissions the Partnership's unit continued to trade at artificially inflated prices throughout the Relevant Period.

164.    The statements identified in ¶¶ 137, 139, 142-158, 160-161, 163-165 were materially false and misleading, and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Defendants improperly failed to disclose, *inter alia*, that: (1) Energy Transfer had failed to maintain internal controls and proper procedures to prevent contractors from engaging in illegal HDD activities; (2) the Partnership failed to mitigate known problems in connection with the foregoing; (3) Energy Transfer, through Rover, hired third-party contractors who engaged in illegal HDD activities which caused massive pollution near the Tuscarawas River; and (4) the severity of the potential civil liabilities as a result of the FERC's Enforcement Staff investigation into the April 13 Release. As a result of the foregoing, Energy Transfer's public statements were materially false and misleading at all relevant times.

**The Truth Fully Emerges**

***December 16, 2021, FERC Order***

165.    On December 16, 2021, FERC issued an Order to Show Cause and Notice of Proposed Penalty (the "FERC Order") to Rover. This order provided Rover 30 days to respond and show why it should not receive a $40 million civil penalty for the conduct in relation to the April 13 Release. The alleged misconduct provided within the order were that: (1) "Rover HDD crews intentionally used diesel fuel and other toxic substances and unapproved additives in the drilling mud"; (2) "Rover HDD crews [had] failed to monitor the right-of-way; and (3) "Rover HDD crews failed to properly dispose of IR mud contaminated with diesel fuel and hydraulic oil.

166.    The December 16, 2021, order also revealed that, on March 18, 2017, when Pretec's crew was commencing HDD near the Tuscarawas River, the crew began to experience large losses of drilling fluid. Rover HDD crew members have admitted under oath with

corroborating stories that from April 2, 2017, to April 13, 2017, several members of the HDD crew intentionally and routinely added toxic diesel fuel, hydraulic oil, contaminated containment fluids, and non-toxic but unapproved lubricants into the drilling fluid to fight drilling difficulties. The crew has admitted that the intention behind doing so, was to maintain speed to keep up with the tight construction schedule as they were under heavy pressure from Rover's management. Specifically, the order states, in relevant part:

> Contemporaneous evidence demonstrates that these violations were the product of a corporate culture—one that equally infected the executives managing the Tuscarawas River HDD and the onsite HDD crew—that favored speed and construction progress over regulatory compliance. This culture was fueled by Rover's execution of a $1.5 billion "time is of the essence" contract with a prime construction contractor—which constituted 35% of Rover's initial cost estimate for the Project.8 It was also fueled by Rover's self-imposed four-month schedule to complete over 500 miles of the pipeline construction. In addition to the contract requirements, Rover's Executive Vice President of Engineering and Construction, Yousif (Joey) Mahmoud, continually applied direct pressure on the Vice President of its prime contractor, Bobby Poteete, to speed up construction, which funneled down to its subcontractor and HDD crews onsite.

167.    The FERC Order also disclosed that on October 3, 2017, Joey Mahmoud ("Mahmoud"), Executive Vice President of Engineering and Construction of Rover, submitted an affidavit to the FERC Enforcement Staff addressing his failure to adhere to OEP and Enforcement Staff's preservation notices. The affidavit stated that Mahmoud was locked out of his phone, requiring him to reset it, which deleted all of the data stored on it. An additional subpoena was issued by FERC Enforcement Staff in November of 2017 requesting Rover produce additional documents. Rover's procurement of documents was reportedly completed in March 2018, however, on May 21, 2018, Rover procured an additional 4,000 documents that were previously withheld or redacted and were not included in their privilege claims. Rover's procurement of the documents was nearly a year after the original data request and eight months from the subpoena

deadlines. Since June 2017, FERC Enforcement Stall has reviewed more than 25,000 documents provided by Rover and other third parties, along with the testimony of 24 witnesses.

168.    The FERC Order further revealed that on January 19, 2021, the Enforcement Staff issued a notice to Rover stating that it would be recommending that FERC issue the FERC Order. The Partnership failed to disclose this information to the investing public.

169.    On this news, Energy Transfer's unit price fell $0.14 per unit, or 1.6%, from $8.49 per unit at close on December 16, 2021, to $8.35 per unit at close on December 17, 2021. The unit continued to fall the following two trading day, dropping an additional $0.17 per unit, or 2%, to $8.18 per unit at close on December 21, 2021, and fell a total of $0.31 per unit, or 3.6% from the initial day.

## DAMAGES TO ENERGY TRANSFER

170.    As a direct and proximate result of the General Partner and the Individual Defendants' conduct, Energy Transfer will lose and expend many millions of dollars.

171.    Such expenditures include, but are not limited to, costs and legal fees associated with defending the illegal HDD conduct and the Securities Class Action filed against the Partnership and certain of the Individual Defendants, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

172.    As a direct and proximate result of the General Partner and the Individual Defendants' conduct, Energy Transfer has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Partnership's unit in the future due to the Partnership's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

173.    Plaintiff brings this action derivatively and for the benefit of Energy Transfer to redress injuries suffered, and to be suffered, as a result of the Defendants' breaches of their fiduciary duties as general partner, controlling unitholder, directors and/or officers of Energy Transfer, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, as well as the aiding and abetting thereof.

174.    Energy Transfer is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

175.    Plaintiff is and has been since before the beginning of the Relevant Period, a unitholder of Energy Transfer. Plaintiff will adequately and fairly represent the interests of Energy Transfer in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

176.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

177.    A pre-suit demand on the General Partner is futile and, therefore, excused. Demand is excused as to the General Partner because Defendant LE GP faces a substantial likelihood of liability as a result of its knowing engagement in the scheme to allow the Partnership to engage in illegal HDD activities, and to cause the Partnership to make false and misleading statements and omissions of material fact to the investors and the general public that falsely represented the Partnership's performance and value. As the direct beneficiary and the primary controller of the above-alleged scheme, the General Partner benefited at the expense of the Partnership. As the General Partner breached its fiduciary duties to the Partnership, it faces a

substantial likelihood of liability, and it is not independent or disinterested, and thus demand on the General Partner is futile.

178.   Additionally, as the Partnership admitted in its 2021 10-K, the General Partner and its affiliates have conflicts of interests, which may cause them to favor their own interests to the detriment of the Partnership and its unitholders. The 2021 10-K stated the following:

> Conflicts of interest may arise among our general partner and its affiliates, on the one hand, and us, on the other hand. As a result of these conflicts, our general partner may favor its own interests and the interests of its affiliates over our interests.

179.   As a result of the foregoing, the General Partner breached its fiduciary duties, faces a substantial likelihood of liability in this Action, is not disinterested, and demand upon it is futile, and thus excused.

180.   Additional reasons that demand on the General Partner is futile follow.

181.   First, all the directors on the Board of the General Partner have fiduciary duties to the General Partner, and in controlling the General Partner, they would cause it not to consider a demand fairly because granting the demand would hurt it.

182.   Second, the majority of the Board of the General Partner is not independent or disinterested, as each of them either knowingly or recklessly participated in the conduct alleged herein, in complete abdication of their fiduciary duties to the Partnership, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the General Partner. At the time of filing of this action, the Board of directors of the General Partner consisted of Defendants Warren, Long, Anderson, Brannon, Davis, Grimm, McCrea, McReynolds, Perry, and Ramsey (collectively, the "Director-Defendants").

183.   Additional reasons that Defendant Warren is not independent or disinterested follow. Defendant Warren is a co-founder of the Partnership, has served as the General Partner's

Executive Chairman since 2007, and served as CEO from August 2007 through December 2020. He is also the majority owner of the General Partner. Thus, as the Partnership admits, he is a non-independent director. As a controlling unitholder with control over the General Partner, Defendant Warren was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the SEC filings referenced herein, all of which he signed or authorized the signing of. As the General Partner's controlling interest-holder and as a trusted Director, he conducted little, if any, oversight of the scheme to allow the Partnership to engage in illegal HDD activities, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Warren signed, and thus personally made the false and misleading statements in the 2017 10-K, the 2018 10-K, the 2019 10-K, and the 2020 10-K. Moreover, Defendant Warren is a defendant in the Securities Class Action. For these reasons, Defendant Warren breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

184.    Additional reasons that Defendant Long is not independent or disinterested follow. Defendant Long has served as the General Partner's Co-CEO since January 2021, CFO from February 2016 through January 2021, and has served as a director of the General Partner since April 2019. Thus, as the Partnership admits, he is a non-independent director. The General Partner provides Defendant Long with his principal occupation, and he receives handsome compensation, including $19,730,203 in 2021 for his services and has received a total of $38,225,533 throughout the Relevant Period. As such, Defendant Long is beholden to the General Partner. As the General Partner's Co-CEO and as a trusted Director, he conducted little, if any, oversight of the scheme

to allow the Partnership to engage in illegal HDD activities, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Long signed, and thus personally made the false and misleading statements in the 2017 10-K, the 2018 10-K, the 2019 10-K, and the 2020 10-K. Moreover, Defendant Long is a defendant in the Securities Class Action. For these reasons, Defendant Long breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

185.   Additional reasons that Defendant McCrea is not independent or disinterested follow. Defendant McCrea has served as the Co-CEO of the General Partnership since January 2021, served as President and CCO of the General Partner from October 2018 through December 2020, and has served as a director of the General Partner since December 2009. Thus, as the Partnership admits, he is a non-independent director. The General Partner provides Defendant McCrea with his principal occupation, and he receives handsome compensation, including $21,460,652 in 2021 for his services and received a total of $63,137,672 throughout the Relevant Period. As such, Defendant McCrea is beholden to the General Partner. As the General Partner's Co-CEO, and as a trusted Director, he conducted little, if any, oversight of the scheme to allow the Partnership to engage in illegal HDD activities, and make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant McCrea signed, and thus personally made the false and misleading statements in the 2017 10-K, the 2018 10-K, the 2019 10-K, and the 2020 10-K. Moreover, Defendant McCrea is a defendant in the Securities Class Action. For these reasons, Defendant McCrea breached his

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

186.    Additional reasons that Defendant McReynolds is not independent or disinterested follow. Defendant McReynolds served as the President of the General Partner from March 2005 until October 2018; on which date he became Special Advisor to the General Partner. He has also served as a director of the General Partner since August 2005. Thus, as the Partnership admits, he is a non-independent director. The General Partner provides Defendant McReynolds with his principal occupation, and he receives handsome compensation, having received a total of $2,789,686 throughout the Relevant Period for his services. As such, Defendant McReynolds is beholden to the General Partner. As the General Partner's trusted director, he conducted little, if any, oversight of the scheme to allow the Partnership to engage in illegal HDD activities, and make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant McReynolds signed, and thus personally made the false and misleading statements in the 2017 10-K, 2018 10-K, 2019 10-K, and the 2020 10-K. Moreover, Defendant McReynolds is a defendant in the Securities Class Action. For these reasons, Defendant McReynolds breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

187.    Additional reasons that Defendant Anderson is not independent or disinterested follow. Defendant Anderson has served as a director of the General Partner since June 2018. He also serves as a member of the Audit Committee as well as the Compensation Committee. Defendant Anderson has received and continues to receive compensation for his roles with the

Partnership as described above. As a trusted Director, he conducted little, if any, oversight of the scheme to allow the Partnership to engage in illegal HDD activities, and make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Anderson signed, and thus personally made the false and misleading statements in the 2018 10-K, 2019 10-K, and the 2020 10-K. For these reasons, Defendant Anderson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

188.   Additional reasons that Defendant Brannon is not independent or disinterested follow. Defendant Brannon has served as a director of the General Partner since March 2016. He also serves as chair of the Audit Committee. Defendant Brannon has received and continues to receive compensation for his roles with the Partnership as described above. As a trusted Director, he conducted little, if any, oversight of the scheme to allow the Partnership to engage in illegal HDD activities, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Brannon signed, and thus personally made the false and misleading statements in the 2017 10-K, the 2018 10-K, the 2019 10-K, and the 2020 10-K. For these reasons, Defendant Brannon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

189.   Additional reasons that Defendant Davis is not independent or disinterested follow. Defendant Davis is a co-founder of the Partnership and has served as a director of the

General Partner since July 2018. He is also a member of the Audit Committee. Defendant Davis has received and continues to receive compensation for his roles with the Partnership as described above. As a trusted Director, he conducted little, if any, oversight of the scheme to allow the Partnership to engage in illegal HDD activities, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Davis signed, and thus personally made the false and misleading statements in the 2018 10-K, the 2019 10-K, and the 2020 10-K. For these reasons, Defendant Davis breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

190. Additional reasons that Defendant Grimm is not independent or disinterested follow. Defendant Grimm has served as a director of the General Partner since October 2018. He also serves as Chair of the Compensation and as a member of the Audit Committee. Defendant Grimm has received and continues to receive compensation for his roles with the Partnership as described above. As a trusted Director, he conducted little, if any, oversight of the scheme to allow the Partnership to engage in illegal HDD activities, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Grimm signed, and thus personally made the false and misleading statements in the 2018 10-K, the 2019 10-K, and the 2020 10-K. For these reasons, Defendant Grimm breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

191.   Additional reasons that Defendant Perry is not independent or disinterested follow. Defendant Perry has served as a director of the General Partner since January 2020. Defendant Perry has received and continues to receive compensation for his role with the Partnership as described above. As a trusted Director, he conducted little, if any, oversight of the scheme to allow the Partnership to engage in illegal HDD activities, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Perry signed, and thus personally made the false and misleading statements in the 2019 10-K and the 2020 10-K. For these reasons, Defendant Perry breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

192.   Additional reasons that Defendant Ramsey is not independent or disinterested follow. Defendant Ramsey has served as a director of the General Partner since July 2012 and as the COO of the General Partner from October 2018 through April 2021. Thus, as the Partnership admits, he is a non-independent director. The General Partner provides Defendant Ramsey with his principal occupation, and he receives handsome compensation, including $2,103,955 in 2021 for his services and received a total of $20,455,190 throughout the Relevant Period. As such, Defendant Ramsey is beholden to the General Partner. As the General Partner's COO and as a trusted Director, he conducted little, if any, oversight of the scheme to allow the Partnership to engage in illegal HDD activities, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Ramsey signed, and thus personally made the false and misleading statements in the 2017 10-K, the 2018

10-K, 2019 10-K, and the 2020 10-K. For these reasons, Defendant Ramsey breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

193.    Additional reasons that the Director-Defendants are not independent or disinterested follow.

194.    The Director-Defendants, who are named as defendants in this action, control the General Partner and have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently.

195.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Partnership's internal controls over public reporting and of the Partnership's engagement in the scheme to allow the Partnership to engage in illegal HDD activities, and to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. In violation of the Code of Conduct, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and are not independent or disinterested.

196.    In violation of the Code of Ethics, Defendants Long, McCrea, and Whitehurst conducted little, if any, oversight of the Partnership's internal controls over public reporting and of the Partnership's engagement in the scheme to allow the Partnership to engage in illegal HDD activities, and to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. In violation of the Code of Ethics, Defendants Long, McCrea, and Whitehurst failed to comply with the law.

Thus, Defendants Long, McCrea, and Whitehurst face a substantial likelihood of liability and are not independent or disinterested.

197.    Energy Transfer has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the General Partner has not filed any lawsuits against itself or others who were responsible for that wrongful conduct to attempt to recover for Energy Transfer any part of the damages Energy Transfer suffered and will continue to suffer thereby. Thus, any demand upon the General Partner would be futile.

198.    The Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Partnership's Partnership Agreement (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to cause the General Partner to pursue this action on behalf of the unitholders of the Partnership.

199.    The acts complained of herein constitute violations of fiduciary duties owed by the General Partner and its officers and directors, and these acts are incapable of ratification.

200.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Partnership to purchase it for their protection with corporate funds, i.e., monies belonging to the unitholders of Energy Transfer. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Partnership against the Director-

Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to cause the General Partner to sue themselves or certain of the officers of the General Partner, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to cause the General Partner to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Partnership to effectuate a recovery. Thus, demand on the General Partner is futile and, therefore, excused.

201.     If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause General Partner to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

202.     Thus, for all of the reasons set forth above, the General Partner cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the General Partner is excused as futile.

## FIRST CLAIM

### Against Defendants for Breach of Fiduciary Duties

203.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

204.     Defendants owed to the Partnership the duty to exercise candor, good faith, and loyalty in the management and administration of Energy Transfer's business and affairs.

205.     Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

206.     Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Partnership, as alleged herein.

Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Energy Transfer.

207.    In breach of their fiduciary duties owed to Energy Transfer, Defendants willfully or recklessly caused the Partnership to engage in illegal HDD activities, and make false and misleading statements and omissions of material fact that failed to disclose that: (1) Energy Transfer had failed to maintain internal controls and proper procedures to prevent contractors from engaging in illegal HDD activities; (2) the Partnership failed to mitigate known problems in connection with the foregoing; (3) Energy Transfer, through Rover, hired third-party contractors who engaged in illegal HDD activities which caused massive pollution near the Tuscarawas River; and (4) the severity of the potential civil liabilities as a result of the FERC's Enforcement Staff investigation into the April 13 Release. As a result of the foregoing, the Partnership's public statements were materially false and misleading at all relevant times.

208.    Defendants failed to correct and/or caused the Partnership to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Partnership for breaching their fiduciary duties.

209.    Also, in breach of their fiduciary duties, Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

210.    Defendants had actual or constructive knowledge that they had caused the Partnership to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. Defendants had actual knowledge that the Partnership was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Partnership to

improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Energy Transfer's units and benefitting third parties.

211.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Partnership's corporate interests.

212.    As a direct and proximate result of Defendants' breaches of their fiduciary obligations, Energy Transfer has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, Defendants are liable to the Partnership.

213.    Plaintiff on behalf of Energy Transfer has no adequate remedy at law.

## SECOND CLAIM

### Against Defendants for Unjust Enrichment

214.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

215.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Defendants were unjustly enriched at the expense of, and to the detriment of, Energy Transfer.

216.    The Defendants either benefitted financially from the improper conduct, including from the receipt of bonuses, unit options, or similar compensation from the General Partner that was tied to the performance or artificially inflated valuation of Energy Transfer, or received compensation that was unjust in light of the Defendants' bad faith conduct.

217.    Plaintiff, as a unitholder and a representative of Energy Transfer, seeks restitution from the Defendants and seeks an order from this Court disgorging all profits, including from benefits and other compensation, including any performance-based or valuation-based

compensation, obtained by the Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

218.     Plaintiff on behalf of Energy Transfer has no adequate remedy at law.

## THIRD CLAIM

### Against Defendants for Abuse of Control

219.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

220.     Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Energy Transfer, for which they are legally responsible.

221.     As a direct and proximate result of Defendants' abuse of control, Energy Transfer has sustained significant damages. As a direct and proximate result of Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Energy Transfer has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, Defendants are liable to the Partnership.

222.     Plaintiff on behalf of Energy Transfer has no adequate remedy at law.

## FOURTH CLAIM

### Against Defendants for Gross Mismanagement

223.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

224.     By its actions alleged herein, Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Energy Transfer in a manner consistent with the operations of a limited partnership.

225.    As a direct and proximate result of Defendants' gross mismanagement and breaches of duty alleged herein, Energy Transfer has sustained and will continue to sustain significant damages.

226.    As a result of the misconduct and breaches of duty alleged herein, Defendants are liable to the Partnership.

227.    Plaintiff on behalf of Energy Transfer has no adequate remedy at law.

### FIFTH CLAIM

**Against Defendants for Waste of Corporate Assets**

228.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

229.    As a result of the foregoing, and by failing to properly consider the interests of the Partnership and its public unitholders, Defendants have caused Energy Transfer to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Partnership and its products.

230.    As a result of the waste of corporate assets, the Defendants are each liable to the Partnership.

231.    Plaintiff on behalf of Energy Transfer has no adequate remedy at law.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Partnership's favor against all Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Energy Transfer, and that Plaintiff is an adequate representative of the Partnership;

(b)    Declaring that the Defendants have breached their fiduciary duties to

Energy Transfer;

(c)     Determining and awarding to Energy Transfer the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Energy Transfer and the Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Energy Transfer and its unitholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for unitholder vote the following resolutions for amendments to the Partnership's Partnership Agreement and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen Defendant LE GP's Board's supervision of operations and develop and implement procedures for greater unitholder input into the policies and guidelines of the Board;

2. a provision to permit the unitholders of Energy Transfer to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Energy Transfer restitution from Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated: July 14, 2022,                      Respectfully submitted,

**COCHRAN LAW PLLC**


 */s/ Stuart L. Cochran* _____
Stuart L. Cochran
State Bar No.: 24027936
8140 Walnut Hill Lane, Suite 250
Dallas, TX 75230
Telephone: (469) 333-3405
Email: stuart@scochranlaw.com

*Liaison Counsel for Plaintiff*

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## VERIFICATION

I, Gary Elliott, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of July, 2022.

_Gary Elliott_
Gary Elliott